M & F WORLDWIDE CORP., MCG Intermediate Holdings Inc., Mafco Worldwide Corp., Mafco Consolidated Group LLC, and PCT International Holdings Inc., Petitioners,

v.

PEPSI–COLA METROPOLITAN BOTTLING COMPANY, INC., Respondent

No. 15–0083

Supreme Court of Texas.

Argued October 3, 2016

OPINION DELIVERED: March 3, 2017

Deborah C. Milner, Harry M. Reasoner, J. Eric Pardue, Vinson & Elkins LLP, Houston TX, Michael Andrew Heidler, Vinson & Elkins LLP, Austin TX, for Petitioners.

Allyson Newton Ho, Morgan, Lewis & Bockius LLP, Dallas TX, David Jack Levy, John M. Deck, Winstol D. Carter Jr., Morgan Lewis & Brockius LLP, Houston TX, for Respondent.

Justice Lehrmann delivered the opinion of the Court.

In this case involving issues of personal jurisdiction, we consider the trial court's denial of special appearances filed by several related nonresident corporate defendants that entered into an agreement with Texas companies to settle a New York lawsuit. The nonresident plaintiff in this

suit alleges that, by virtue of the settlement agreement, the parties to the agreement tortiously interfered with another nonresident company's indemnity obligations to the plaintiff. To support Texas's specific jurisdiction over the nonresident defendants, the plaintiff alleges that the agreement was partially negotiated in Texas, both during in-person meetings and by communications directed to Texas, and that the agreement was substantially performed in Texas. The trial court and court of appeals concluded that Texas has specific jurisdiction over the nonresident defendants. We disagree and reverse the court of appeals' judgment.

## I. Background

### A. Overview

We will attempt to distill the complex facts of the underlying lawsuit to those necessary to resolve the special appearances under review. The plaintiff is Pepsi–Cola Metropolitan Bottling Company, Inc. (Pepsi), a New Jersey company with its principal place of business in New York. Pepsi sued two groups of defendants: the Cooper defendants,[1] which are either based or have operations in Texas and are not parties to this interlocutory appeal, and the Mafco defendants. The Mafco defendants, all related Delaware companies with principal places of business in either New York or New Jersey, include M & F Worldwide Corp. (M & F Worldwide), MCG Intermediate Holdings, Inc. (Intermediate Holdings), Mafco Worldwide Corp. (Mafco Worldwide), Mafco Consolidated Group LLC (Mafco Consolidated), and PCT International Holdings, Inc. (International Holdings). The Cooper and Mafco defendants have no corporate relationship with each other.

In this suit, Pepsi complains about the effect of a 2011 settlement agreement, along with several associated ancillary agreements, that resolved a New York lawsuit filed by Pneumo Abex, LLC, a then-subsidiary of International Holdings, against the Cooper defendants and an unrelated entity. As discussed further below, the New York lawsuit arose from alleged disputes over indemnity obligations that some of the Cooper and Mafco defendants owed Pneumo Abex for asbestos-related claims. Pneumo Abex in turn had asbestos-related indemnity obligations to Pepsi, and Pepsi claims that the settlement agreement interfered with those obligations. The Mafco defendants' corporate relationship immediately before execution of the settlement agreement is illustrated below[2]:

MacAndrews & Forbes Holding, Inc.[3]

M&F Worldwide

Mafco Consolidated

International Holdings

Intermediate Holdings

Mafco Worldwide

Pneumo Abex

1. The Cooper defendants are Cooper Industries, LLC, Cooper Holdings, Ltd., Cooper Industries, Ltd., Cooper US, Inc., and Cooper Industries, PLC.

2. This illustration may not reflect some intervening subsidiaries.

## B. Development of the Parties' Indemnity Obligations

Pursuant to a 1988 stock-purchase agreement between Pepsi's and Pneumo Abex's predecessors, Pneumo Abex agreed to indemnify Pepsi for certain product-liability claims, including asbestos-related claims (Product Claims).[4] In 1995, Pneumo Abex became a wholly owned subsidiary of International Holdings (itself a subsidiary of M & F Worldwide). As part of this transaction, newly created Intermediate Holdings (a subsidiary of Mafco Consolidated) began managing a subset of the Product Claims brought against Pneumo Abex. Under various unrelated transactions and agreements, both Cooper Industries, LLC (Cooper) and International Holdings subsidiary Mafco Worldwide assumed indemnity obligations to Pneumo Abex covering the same Product Claims for which Pneumo Abex owed indemnity to Pepsi. Cooper assumed its indemnity obligations under a 1994 guaranty agreement executed when Cooper's subsidiary purchased Pneumo Abex's friction-products business, and Mafco Worldwide assumed separate indemnity obligations during a 2004 corporate restructuring for Product Claims arising from aerospace products.[5] Mafco Worldwide also agreed to advance funds that were owed, but not yet paid, to Pneumo Abex by third-party indemnitors or insurers for Product Claims. Cooper's indemnity obligations to Pneumo Abex were administered separately from Mafco Worldwide's. Since 2004, Pneumo Abex has conducted no business operations and owns no assets other than the indemnity rights and obligations related to the Product Claims.

## C. The Rise of "Plan C"

For several years before Pneumo Abex filed the New York lawsuit in 2010, representatives of the Cooper and Mafco defendants had discussions about their respective obligations with respect to Pneumo Abex's liabilities. Between December 2007 and March 2010, MacAndrews, Mafco Consolidated, Pneumo Abex, M & F Worldwide, and Mafco Worldwide entered into a series of tolling agreements with the Cooper defendants regarding their potential claims against each other. The parties to this suit characterize the ongoing discussions during this time period quite differently. According to the Mafco defendants, the discussions arose out of concerns about Pneumo Abex's ongoing reliance on other entities to manage and fund its liabilities, as well as disputes between the Mafco and Cooper defendants over the allocation and management of those liabilities. Pepsi counters that the defendants engaged in a "joint scheme to rid themselves" of their indemnity obligations that culminated in the filing and settlement of the New York lawsuit.

In early 2008, the Mafco and Cooper defendants began general discussions about what was informally called Plan C, which at that time generally referenced attempts to resolve the Pneumo Abex in-

---

4. The indemnity obligations were reciprocal. Pepsi agreed to indemnify Pneumo Abex for Product Claims filed before August 29, 1998, while Pneumo Abex agreed to indemnify Pepsi for claims filed after that date. Pepsi's in-

demnity obligations to Pneumo Abex are not at issue here.

5. Mafco Worldwide's obligations were subject to a ten-year term and a $10 million cap, and applied only to liabilities not indemnified or insured by another party.

demnity issues.[6] One of the early Plan C proposals involved the creation of a trust to assume ownership of Pneumo Abex, with asset contributions to be made to the trust by International Holdings (Pneumo Abex's parent company) and Cooper.

In February 2009, representatives of the Mafco defendants traveled to Houston to meet with Texas-based Cooper representatives "about Plan C." In a subsequent e-mail exchange, a Cooper executive wrote to Steven Fasman, who was authorized to represent all the Mafco defendants, that "we will need an IRS private letter ruling to do this deal." In July 2009, five months after the Houston meeting, M & F Worldwide sent a letter to the Internal Revenue Service regarding Mafco Worldwide's intent to submit a request for a ruling on the tax implications of a proposed transaction—the then-embodiment of Plan C—involving the creation of a trust intended to qualify under IRS regulations as a "qualified settlement fund." According to the letter, the trust would be part of the settlement of disputed claims between Pneumo Abex and Cooper regarding Cooper's indemnity obligations for the Product Claims. The transaction contemplated that Pneumo Abex and Cooper would assert their claims against each other "in an appropriate court" and obtain court approval of the settlement. The proposal involved payments to the trust by Cooper, mutual releases of the disputed claims and a release of Cooper's indemnity obligations, and International Holdings' assignment to the trust of all its interest in Pneumo Abex, resulting in the trust's being primarily liable for the Product Claims.

In November 2009, Fasman traveled to Texas to meet with Cooper representatives and an attorney hired by Cooper's board to serve as an independent advisor regarding Plan C. The meeting took place in the attorney's Dallas office, and the meeting's purpose was "a discussion with this lawyer about his opinions regarding Plan C." According to Fasman, the discussion primarily involved the attorney's suggestion that the parties resolve their disputes by placing Pneumo Abex into bankruptcy, a suggestion the parties rejected on account of the company's solvency. Fasman testified that Plan C was discussed during "breaks in the meeting."

In January 2010, M & F Worldwide submitted to the IRS—on behalf of itself, International Holdings, and Pneumo Abex—the contemplated formal request for a ruling regarding the tax implications of the proposed transaction described in the July 2009 letter. In addition to the transaction terms outlined in that letter, the request explained that the parties intended Pneumo Abex and Cooper to assert their disputed claims against each other in a Texas court. Further, the parties contemplated payments to the proposed trust by both International Holdings and Cooper, as well as the appointment of a management company to administer the Product Claims.

### D. The New York Lawsuit and Settlement Agreement

According to Fasman, the parties never reached a formal agreement on the proposals outlined in the IRS ruling request, "the discussions lapsed," and the ruling request was withdrawn. Instead, in May 2010, Pneumo Abex filed the New York lawsuit against the Cooper defendants and an unrelated company, Danaher Corporation.[7] In that lawsuit, Pneumo Abex sought to enjoin a proposed joint venture between

---

6. Plans A and B did not come to fruition and are not at issue here.

7. The New York lawsuit was filed on May 5, and the IRS ruling request was withdrawn two days later.

Cooper and Danaher, which Pneumo Abex alleged was part of a fraudulent scheme that would strip Cooper of its assets and impair its ability to fulfill its indemnity obligations to Pneumo Abex. Notes from a "courtesy" discussion between a Mafco representative and Cooper's CEO the day the lawsuit was filed reflect the Mafco defendants' communication that the lawsuit had been filed "reluctantly" in order to "protect Pneumo Abex's ability to rely on its guarantor [Cooper] for decades to come," and that "[o]ne reason that we made the decision to sue now is that we are no longer optimistic that Plan C, or any other long-term solution, is possible." However, the notes also state that "we continue to believe that Plan C (a Cooper-funded trust that would own Pneumo Abex and would release and indemnify both Cooper and [Mafco Worldwide]) is the better way to go."

Shortly after the New York lawsuit was filed and the court denied Pneumo Abex's request for a temporary injunction, the parties commenced settlement negotiations. Although the Mafco defendants were not parties to that suit, they all took part in those negotiations (with the exception of Intermediate Holdings) because of the potential for the assertion of cross-claims against them. The settlement discussions focused fairly quickly on Plan C, with drafts of a "Plan C Settlement Agreement" exchanged as early as July 2010. The negotiations continued throughout 2010 and into 2011. The parties never conducted in-person discussions in Texas, and Fasman testified that "the majority of the negotiations were carried out by individuals located in New York and Washington, D.C. at the times that they were negotiating." However, the discussions involved numerous phone calls and e-mail exchanges between Mafco representatives and Texas-based Cooper representatives.

The New York lawsuit was resolved by a settlement agreement executed on February 1, 2011 and several associated agreements executed on April 5, 2011. The parties to the settlement agreement were Pneumo Abex, the Cooper defendants, and all Mafco defendants except Intermediate Holdings (although the agreement did bind Intermediate Holdings as a Mafco Worldwide subsidiary). The New York court approved the settlement agreement and retained jurisdiction over subsequent disputes related to that agreement. The parties agreed in pertinent part:

- All claims among the parties and their affiliated entities involving the Product Claims were released.

- International Holdings would transfer its ownership interest in Pneumo Abex to a trust (Trust) to be established under Delaware law.

- Cooper would contribute $307,500,000 to the Trust.

- International Holdings would contribute $5 million to the Trust, and Mafco Worldwide and International Holdings would each pay $7.5 million to Pneumo Abex.

- The Trust would be responsible for Pneumo Abex's indemnity obligations, and Cooper's and Mafco Worldwide's indemnity obligations to Pneumo Abex would terminate.

- The Trust would have one Delaware trustee, and the two additional initial trustees would be Terry A. Klebe (a former Cooper employee residing in Arizona) and Sandra A. Bloch (a Pennsylvania resident).

- Pneumo Abex would enter into an agreement with an unspecified management company to be owned and controlled by the Trust, and that company would "manage the affairs of Pneumo Abex on a day-to-day ba-

sis," including matters related to the Product Claims.

- Intermediate Holdings and Cooper would provide consulting services to the management company without compensation for six months "[t]o assist a smooth transition of responsibility" for the Product Claims.
- M & F Worldwide would cooperate with the Trust in its defense of the Product Claims for nine months.
- The parties would deliver the information and documents necessary to effectuate the agreement.

The agreement contained a New York forum-selection clause and a New York choice-of-law clause.

Pursuant to the settlement agreement, International Holdings assigned its interest in Pneumo Abex to the Trust, which was created under Delaware law. Cooper and International Holdings made the required payments to bank accounts established at Wells Fargo in Minnesota. Pneumo Abex entered into a management agreement with Integra Management Company, LLC, a Delaware company with offices in Spring, Texas, to assume management of all Product Claims asserted against Pneumo Abex. Integra's manager was Keith Odenweller, a former Cooper employee residing in Texas. The management agreement was signed by Klebe, Bloch, and Odenweller. As noted, the settlement agreement itself did not specify Integra as the requisite management company, and the Mafco defendants did not select either Integra or Odenweller and were not involved in the decision to locate Integra in Texas. The record evidence indicates that Cooper favored Odenweller's involvement and that the Mafco defendants "did not object" to his selection as Integra's manager. It further indicates that the Mafco defendants were aware of both Odenweller's selection and Integra's

Texas location before the management agreement's execution.

Also pursuant to the settlement agreement, Mafco Worldwide and Intermediate Holdings entered into the anticipated six-month consulting agreement with Pneumo Abex and Integra. Following the closing, Pneumo Abex documents were shipped to Integra in Texas. In addition, Fasman provided information to Odenweller "about historical Pneumo Abex files and operations so that the Trust would be equipped to manage the claims against Pneumo Abex going forward."

### E. The Underlying Suit

In December 2011, Pepsi sued the Mafco and Cooper defendants for fraudulent transfer, tortious interference with the 1988 stock-purchase agreement, and conspiracy, alleging the Trust that had assumed ownership of Pneumo Abex and responsibility for its asbestos liabilities was underfunded, leaving Pneumo Abex unable to meet its defense and indemnity obligations to Pepsi. Pepsi alleged that Texas courts had both general and specific jurisdiction over the Mafco defendants. Relevant to specific jurisdiction, Pepsi alleged that the Mafco defendants had traveled to Texas in 2009 to discuss Plan C and had entered into contracts with the Texas-resident Cooper defendants that required substantial performance in Texas. The Mafco defendants filed special appearances, which the trial court denied.

The court of appeals affirmed. 453 S.W.3d 492 (Tex. App.–Houston [14th Dist.] 2014). The court concluded that Fasman's two 2009 trips to Texas were "dispositive of the issue of whether the Mafco [d]efendants purposefully availed themselves of the privileges of doing business in Texas." *Id.* at 505. The court reasoned that these trips led to further communication between the Mafco and Texas-resident

Cooper defendants regarding Plan C, and ultimately culminated in the execution of the settlement agreement that called for the creation of Integra, which was operated in Texas, to manage the Trust that would own Pneumo Abex. *Id.* at 506–08. Accordingly, the court of appeals held that an integral part of the alleged tort occurred in Texas and that the Mafco defendants "sought out Texas and the benefits and protections of its laws." *Id.* at 508 (citation omitted). Because the court of appeals held that Texas courts had specific jurisdiction over the Mafco defendants, it did not reach the general-jurisdiction issues. *Id.* at 509.

■ We granted the Mafco defendants' petition for review.[8] At issue is whether the trial court erred in concluding that it had jurisdiction over the Mafco defendants and denying their special appearances.

## II. Personal Jurisdiction Framework

■ We review determinations of personal jurisdiction de novo. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence." *Id.*[9]

■ Texas's long-arm statute "extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (quoting *U–Anchor Advert., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). A state's exercise of jurisdiction comports with federal due process if the nonresident defendant has "minimum contacts" with the state and the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■ A defendant's contacts with the forum may give rise to either general or specific jurisdiction. General jurisdiction is established when a defendant's contacts "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) (citation omitted). "It involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *PHC–Minden, LP v. Kimberly–Clark Corp.*, 235 S.W.3d 163,

8. We have jurisdiction over interlocutory appeals in which the court of appeals "holds differently from a prior decision of" this Court, meaning that "there is inconsistency in the[] respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." TEX. GOV'T CODE § 22.225(c), (e). The Mafco defendants argue that the court of appeals' decision amounts to a holding that Texas courts have jurisdiction over a defendant who plans a tort in Texas but carries it out elsewhere. The Mafco defendants contend that this holding conflicts with this Court's opinion in *BMC Software Belgium, N.V. v. Marchand*, in which we held that evidence that the defen-

dant "planned to defraud" the plaintiff in Texas did not confer specific jurisdiction with respect to fraud and negligent misrepresentation claims where the alleged misrepresentation, and the plaintiff's reliance thereon, occurred elsewhere. 83 S.W.3d 789, 796–97 (Tex. 2002). We have jurisdiction to resolve the uncertainty resulting from this alleged inconsistency.

9. Like the petitioner in *Moncrief*, the Mafco defendants argue that appellate courts should review a trial court's implied findings de novo when there is no live testimony. As in *Moncrief*, we need not address this argument.

168 (Tex. 2007). However, in this case, we are primarily concerned with whether the nonresident defendants' alleged minimum contacts gave rise to specific jurisdiction, which is triggered when the plaintiff's cause of action arises from or relates to those contacts. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007) (explaining that a specific-jurisdiction analysis requires review of the "relationship among the defendant, the forum[,] and the litigation." (alteration in original) (citation omitted)). Specific jurisdiction must be established on a claim-by-claim basis unless all the asserted claims arise from the same forum contacts. *Moncrief*, 414 S.W.3d at 150–51.

 A defendant's minimum contacts with a forum are established when the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 150 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Three principles govern the purposeful-availment analysis: (1) "only the defendant's contacts with the forum" are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be "purposeful" and not "random, isolated, or fortuitous"; and (3) the defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" such that it impliedly consents to suit there. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (citations omitted). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Retamco*, 278 S.W.3d at 338 (citation omitted).

## III. Analysis

### A. Specific Jurisdiction

 Pepsi summarizes its argument in support of Texas courts' specific personal jurisdiction over the Mafco defendants as follows: the Mafco defendants "twice traveled to Texas to negotiate an allegedly tortious plan with [the Texas-resident Cooper defendants], developed that plan through hundreds of communications sent to Texas, and carried out that plan through agreements performed in Texas." The Mafco defendants respond that Pepsi's claims against them have "nothing to do with Texas" and that Pepsi is not a Texas resident, "does not allege injury from an act in Texas," and does not allege that it suffered harm in Texas. Instead, the Mafco defendants contend, Pepsi relies on (1) its allegation that they partially planned an out-of-state tort in Texas, which is insufficient under this Court's precedent to confer jurisdiction, and (2) the fact that third parties chose Texas-based Integra as Pneumo Abex's management company following execution of the settlement agreement.

 As an initial matter, we note that Pepsi does not assert that any of the Mafco defendants is an alter ego of any other, or that their jurisdictional contacts should be attributed to each other under a veil-piercing theory.[10] *See PHC–Minden*, 235

10. As an alternative argument for reversal of the court of appeals' judgment, the Mafco defendants argue that Pepsi did not sufficiently plead jurisdictional allegations against each individual Mafco defendant, instead making blanket assertions of Texas contacts by those defendants as a group. We need not address this argument because, even assuming the initial jurisdictional allegations were sufficient, we agree with the Mafco defendants that, considering all the evidence, Texas courts lack specific personal jurisdiction over

S.W.3d at 172–73 (holding that the contacts of distinct legal entities, including parents and subsidiaries, must be assessed separately for jurisdictional purposes unless the corporate veil is pierced). We also note that a nonresident's alleged conspiracy with a Texas resident does not confer personal jurisdiction over the nonresident in Texas. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995). Thus, the Mafco defendants' alleged conspiracy with the Texas-resident Cooper defendants, by itself, does not subject the Mafco defendants to Texas courts' jurisdiction.

Turning to the Mafco defendants' relevant contacts with Texas, we first consider the two Texas meetings that the court of appeals found "dispositive." 453 S.W.3d at 505. The court of appeals concluded that the record supported an implied finding that the Mafco and Cooper defendants "began formulating Plan C" at the first meeting, and that the parties "further honed Plan C" during the second meeting. *Id.* at 506–07. The court noted that the "hundreds of emails and telephone calls" exchanged between the Mafco and Cooper defendants after the first meeting "show context for [their] collaboration to develop Plan C." *Id.* at 506. Citing *Moncrief*, the court held that the Texas meetings "can fairly be construed as purposeful availment of the privileges of doing business in Texas." *Id.* We disagree.

In *Moncrief*, we held that Texas courts had specific jurisdiction over nonresident defendants with respect to a misappropriation-of-trade-secrets claim where the defendants "attended two Texas meetings with a Texas corporation and accepted [the plaintiff's] alleged trade secrets created in

Texas regarding a potential joint venture in Texas with the Texas corporation." 414 S.W.3d at 154. The alleged misappropriation—the precise act giving rise to the tort—actually took place in Texas, and it occurred in the process of the defendant's effort to get "extensive business in or from the forum state" in the form of the proposed Texas joint venture. *Id.* at 153 (quoting *Michiana*, 168 S.W.3d at 789–90). We also concluded that Texas courts lacked jurisdiction over the same defendants with respect to a tortious interference claim, explaining that the claim arose out of discussions that took place in California in which the defendants allegedly attempted to convince another entity to proceed with the joint venture without the plaintiff. *Id.* at 157. We held that the defendants' "alleged tortious conduct in California against a Texas resident [was] insufficient to confer specific jurisdiction." *Id.*

Unlike in *Moncrief*, Pepsi does not allege that the Mafco defendants committed torts in Texas by negotiating Plan C, or even that they committed torts against Texas residents. *See id.* at 149 (noting that the plaintiff in *Moncrief* alleged that the nonresident defendants "committed torts in Texas by misappropriating [Texas-resident] Moncrief's alleged trade secrets at Texas meetings"). The torts at issue—fraudulent transfer and tortious interference—hinge on the effect of the parties' execution of the New York settlement agreement and related conduct that occurred outside of Texas. Pursuant to that agreement, a Delaware trust with out-of-state trustees assumed ownership of Pneumo Abex and assumed responsibility for the indemnity obligations previously held by Cooper and Mafco Worldwide. In ex-

them. *See Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010) (explaining that the plaintiff bears the initial burden to plead sufficient jurisdictional allegations against a nonresident defendant, the burden

then shifts to the defendant to negate all alleged bases of personal jurisdiction, and the plaintiff may then respond with evidence that affirms its allegations).

change, Cooper, Mafco Worldwide, and International Holdings contributed funds to the Trust to cover those obligations, and Pepsi straightforwardly alleges that the amount of those funds was insufficient. The crux of Pepsi's claims in this suit is that these actions "left Pneumo Abex in a position where it no longer had control of enough assets to fund its own Product Claims liabilities and also had insufficient assets to honor its indemnity promises to [Pepsi] for all future indemnified claims, including Product Claims."

We agree with the Mafco defendants that the partial negotiation of Plan C in Texas, even assuming the court of appeals correctly viewed the evidence to support an implied finding that the parties "began formulating the plan" here, is akin to the insufficient jurisdictional contacts in *BMC Software*. In that case, Marchand, a Belgian citizen, sued his former employer, a Belgian company, for fraud and negligent misrepresentation, alleging the employer misrepresented that the terms of his employment would include stock options. 83 S.W.3d at 793. To support Texas courts' jurisdiction over the employer, Marchand referenced conversations in Texas between the employer and officers of the employer's parent company, during which they allegedly discussed the stock-options offer that was made to Marchand and "planned to defraud him." *Id.* at 796. We held that the "nature of the [misrepresentation] claims demonstrate[s] that they can only arise from [the employer's] contact with Marchand, which all occurred outside of Texas." *Id.* at 796–97. Similarly, the nature of the fraudulent-transfer and tortious-interference claims here demonstrates that they do not arise from the Plan C negotiations in Texas, even if the evidence supports a finding that, during those negotiations, the Mafco defendants "planned" to later commit such tortious conduct. The

transactions giving rise to those torts simply did not occur in Texas.

However, Pepsi argues that the Mafco defendants' Texas contacts go beyond merely planning a tort in Texas. Relying on *Burger King Corp. v. Rudzewicz*, Pepsi argues that the agreements between the Mafco defendants and the Texas-resident Cooper defendants establish purposeful availment when considered against "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In *Burger King*, the franchise dispute at issue "grew directly out of 'a contract which had a *substantial* connection with [the forum] State.' " *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). Pepsi argues that the agreement underlying Pepsi's claims had such a connection with Texas. Pepsi also cites *Zac Smith & Co. v. Otis Elevator Co.*, in which a subcontractor sued a nonresident for breach of contract in the sale of four elevators to be installed in a Texas hotel. 734 S.W.2d 662, 663 (Tex. 1987). Although the hotel was never built, the defendant had entered into a joint-venture agreement for the sole purpose of building the hotel, and the joint venture executed a construction contract with the owner. *Id.* at 665. Thus, both the joint venture's purpose and the contract with the owner were "wholly performable in Texas," the parties "anticipated a profit from the construction of the hotel in Texas, and the benefits and protections of the laws of this State . . . were called into play." *Id.* at 665–66.

Drawing from these cases, Pepsi argues that the future consequences of the Mafco defendants' "tortious scheme" were directed at Texas and that the "real object of the business transaction" was "the creation of the Trust in Texas as a mechanism for

shedding the Mafco and Cooper [d]efendants' obligations to Pneumo Abex." The source of the Texas connection is Integra, the Texas-based company that took over management of Pneumo Abex's asbestos liabilities following execution of the settlement agreement and Pneumo Abex's transfer to the Trust.

We believe this description overstates the evidence about where the agreements at issue were to be performed and the Mafco defendants' role in any Texas connection. As noted, the settlement agreement called for the establishment of a trust under Delaware law to assume ownership of Pneumo Abex and responsibility for its indemnity obligations. It also called for Pneumo Abex to contract with a management company to manage Pneumo Abex's day-to-day affairs, including the Product Claims. The agreement did not call for a specific management company or require that it operate from any particular location. There is evidence that the Mafco defendants knew Pneumo Abex would contract with Integra and knew that Texas-resident Odenweller would manage Integra, but such knowledge is insufficient to constitute purposeful availment. *See Michiana*, 168 S.W.3d at 787 (holding that a nonresident defendant's sale of an RV to a Texas resident with knowledge that the RV would be taken back to Texas was insufficient to confer jurisdiction). Further, no evidence suggests that the Mafco defendants had any role or authority in selecting Odenweller, Integra, or Integra's location, nor does the evidence indicate that these selections had any bearing on the Mafco defendants' execution of the settlement agreement. Unlike the contract in *Zac Smith*, the settlement agreement does not contemplate or require performance in Texas. *See* 734 S.W.2d at 665–66. Further, it is governed by New York law and contains a New York forum-selection clause. *See Michiana*, 168 S.W.3d at 792 (noting

that "insertion of a clause designating a foreign forum suggests that no local availment was intended"). Moreover, the "unilateral activity of another party or a third person" cannot amount to purposeful availment by the specially appearing defendant. *Id.* at 785 (quoting *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174). Pepsi's assertion that the *Mafco defendants* "established the Trust to operate in Texas and indemnify them from Texas" is simply not supported by the record evidence. Similarly, the record differentiates this case from *Moncrief* because the evidence does not indicate that the Mafco defendants' Texas contacts involved an effort to get "extensive business in or from the forum state." 414 S.W.3d at 153 (citation omitted).

Pursuant to the settlement agreement, Intermediate Holdings and Mafco Consolidated did enter into a six-month consulting agreement with Integra and Pneumo Abex to "provide administrative support and other transition services." The settlement agreement also called for certain of the Mafco defendants to cooperate with the Trust for nine months in making available documents and witnesses in connection with the defense of Product Claims. And because Integra was managing the Product Claims from Texas, Pneumo Abex's records and litigation databases were moved here. With respect to the contemplated consulting agreement, the settlement agreement again did not name Integra, but generically required the provision of administrative and transition services to the entity that would contract with Pneumo Abex as its management company. And we fail to see how the Mafco defendants sought some benefit, advantage, or profit *from Texas* merely by virtue of their cooperation with Integra in the transition of the administration of the Product Claims. Even if they did, and even if these particular contacts were purposeful, they would

subject the Mafco defendants to jurisdiction here only "in suits based on their activities." *Michiana*, 168 S.W.3d at 785. Pepsi's claims have nothing to do with the consulting agreement or the transition of the administration of the Product Claims, and neither Pneumo Abex nor Integra is a party to this suit.

■ In sum, specific personal jurisdiction over a nonresident defendant requires the defendant's purposeful availment of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Moncrief*, 414 S.W.3d at 150. It also requires a "substantial connection" between those activities and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585. In negotiating, executing, and carrying out the settlement agreement, the Mafco defendants did not seek to do business in Texas, commit a tort in Texas, or allegedly cause injury to Pepsi in Texas. Further, to the extent the Mafco defendants purposefully directed activities toward Texas, Pepsi's causes of action do not arise from those contacts. Accordingly, the trial court lacks specific jurisdiction over the Mafco defendants in this suit.

### B. General Jurisdiction

As noted, because the court of appeals affirmed the trial court's denial of the Mafco defendants' special appearances on specific-jurisdiction grounds, it did not reach the issue of whether the Mafco defendants are subject to general jurisdiction in Texas courts. The Mafco defendants request that we nevertheless reach and resolve the issue, arguing that "general jurisdiction plainly does not apply." However, Pepsi does not present the general-jurisdiction issue in this Court as an alternative basis to affirm the court of appeals' judgment, requesting only that we remand to allow that court to address it. We conclude that

the prudent course of action is to remand the case to the court of appeals to address general jurisdiction in the first instance.

### IV. Conclusion

The court of appeals erred in holding that the trial court has specific jurisdiction over the Mafco defendants. Accordingly, we reverse the court of appeals' judgment and remand the case to that court for further proceedings.