**Affirmed and Opinion Filed July 11, 2023**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-00833-CV

### ANCHORA INSURANCE SERVICES, LLC, Appellant
### V.
### TEXAS GREEN STAR HOLDINGS, LLC, Appellee

**On Appeal from the County Court at Law No. 1
Dallas County, Texas
Trial Court Cause No. CC-21-04851-A**

## MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Miskel
Opinion by Justice Pedersen, III

Appellant Anchora Insurance Services, LLC (Anchora) challenges the trial court's August 1, 2022 Order Denying Special Appearance. In three appellate issues, Anchora argues that the trial court erroneously denied its special appearance because the facts show that: Anchora does not have minimum contacts with the State of Texas to support specific jurisdiction over it; Anchora does not have minimum contacts with the State of Texas to support general jurisdiction over it; and exercising personal jurisdiction over Anchora would violate due process. We affirm the trial court's order.

## Background

Anchora is a South Carolina company with its principal place of business in Greenville, South Carolina. Anchora's involvement with appellee Texas Green Star Holdings, LLC (TGS) began when Aaron Smith, the owner and commercial lines manager of Anchora, was contacted in December 2020 by a representative of Five on Fifty Financial Services, LLC (Five on Fifty), another business operating in South Carolina, looking for help in finding insurance coverage for its client, TGS.

TGS describes itself as a minority owned start-up company that purchased a greenhouse property in March 2020 and began preparing its infra-structure for the business of growing lettuce, spinach, kale, and other edible leafy greens for sale to various retailers. Its growing operation is located in Sanger, Texas and occupies 322 acres of land with a multi-building nursery complex. TGS sought the insurance at issue in this case to support its $15 million start-up loan and to protect its assets.

Anchora did not solicit the business of TGS in Texas and, before being approached by Five on Fifty, it had no active license to sell insurance in Texas. However, after being approached, Anchora agreed to try to find the general liability and property insurance TGS was seeking, and it obtained a license to sell insurance in Texas.[1]

---

[1] Smith had previously held an individual license to sell insurance in Texas; when Anchora obtained its license in 2020, Smith renewed his own license as well.

Anchora had a Retail Placement Agreement with Risk Placement Services, Inc. (RPS), a wholesale insurance broker with branch offices that include Roswell, Georgia and Dallas, Texas. Smith reached out to RPS because the markets that Anchora had direct contracts with would not write the property insurance that TGS required. Smith first emailed the DPS Georgia office; he was then referred to its Dallas office (RPS-Dallas), which was managed by Ryan Pike. Smith asked Pike to attempt to get quotes for property insurance for TGS.

Anchora received quotes from RPS-Dallas for the coverage TGS sought and placed the "stacked" insurance coverage with three Texas insurance companies. Anchora arranged financing of the premiums through IPFS Corporation, a commercial insurance financing lender. Pursuant to that financing agreement, TGS made its down payment on coverage by sending its check to Anchora; the check was made out to Anchora Insurance Services, LLC in the amount of $52,706.35. Anchora deposited the check in its bank account and then sent RPS its check for 90% of the amount TGS paid.[2]

In February 2021, Texas was stricken by a five-day-long winter storm with sustained freezing temperatures. The storm resulted in hundreds of deaths and left millions of homes without power. TGS's pleading alleges that its nursery operation was "decimated" by the storm and that it incurred damage in excess of $9 million.

---

[2]  According to Anchora, RPS then retained its commission and sent the remaining funds to the insurance companies.

TGS made a claim on the policies it had obtained through Anchora the year before, but coverage was denied.

TGS sued Anchora, alleging breach of contract and the duty of good faith and fair dealing, negligence, negligent misrepresentation, and violations of the Deceptive Trade Practices Act and the Texas Insurance Code.[3] Anchora filed a special appearance, arguing that the district court lacked personal jurisdiction over it. The trial court denied the special appearance, and this interlocutory appeal followed.[4]

## Discussion

Anchora raises three issues in this Court, contending the trial court erroneously denied its special appearance.

### *Establishing Personal Jurisdiction*

Texas courts may exercise personal jurisdiction over a nonresident defendant if the Texas long-arm statute permits it and asserting jurisdiction is consistent with federal due process guarantees. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). The broad "doing business" language in Texas's long-arm statute allows the trial court's jurisdiction to reach as far as the federal constitutional requirements of due process will allow. *Kelly v. Gen. Interior Const., Inc.*, 301

---

[3] TGS also brought claims against the insurance companies, their insurance adjusting firm, RPS-Dallas, and Pike.

[4] TEX. CIV. PRAC. & REM. ANN. § 51.014(a)(8).

S.W.3d 653, 657 (Tex. 2010).[5] Once the plaintiff has sufficiently invoked the long-arm statute, the nonresident defendant has the burden of negating all bases of jurisdiction alleged in the plaintiff's petition. *Moki Mac,* 221 S.W.3d at 574. Personal jurisdiction over a nonresident defendant satisfies constitutional due process guarantees when (1) the nonresident defendant has established minimum contacts with the forum state and (2) exercising jurisdiction comports with traditional notions of fair play and substantial justice. *See M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017).

Personal jurisdiction may be specific or general in nature. Specific jurisdiction exists when the plaintiff's claims arise out of or relate to the defendant's contacts with the forum. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016). The proper focus of a specific jurisdiction analysis is the defendant's relationship with the forum; the defendant's contacts must be "substantially connected to the alleged operative facts of the case." *Id.* at 67, 70. General jurisdiction is established when a defendant's contacts are sufficiently continuous and systematic that the defendant is essentially "at home" in the forum State. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017) (citing *Goodyear*

---

[5] Under the long-arm statute, Texas courts can exercise personal jurisdiction over a nonresident defendant who "does business" in Texas. CIV. PRAC. & REM. § 17.042. TGS's petition alleged that "Defendant Anchora Insurance Services, LLC ("Anchora") is believed to be a foreign limited liability company doing business in the State of Texas." The plaintiff bears this initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

*Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 131 (2011)). A court with general jurisdiction may exercise jurisdiction over a nonresident defendant based on any claim, even if a claim is unrelated to that defendant's contacts with the state. *Id.* In this case, TGS contends that Anchora's contacts with Texas satisfy both specific and general jurisdiction requirements; Anchora denies that the trial court possessed either.

## *Standard of Review*

Whether a trial court may exercise personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). When, as in this case, the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, we imply all findings of fact necessary to support its ruling that are supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

## *Minimum Contacts*

The threshold inquiry for personal jurisdiction is whether the defendant possesses minimum contacts with the forum state. Minimum contacts are established when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking its laws, benefits, and protections. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657–58 (Tex. 2010). We analyze purposeful availment employing three guidelines: only the

–6–

defendant's contacts are relevant; the contacts must be purposeful, not random, fortuitous, or attenuated; and the defendant must seek some advantage, benefit, or profit by availing itself of the forum. *See Moki Mac*, 221 S.W.3d at 575. In its first appellate issue, Anchora argues that the trial court erred in denying its special appearance because the facts show that it does not have minimum contacts with the State of Texas that would support specific jurisdiction in this case.

Anchora concedes that it acted as a third-party insurance agent in order to find general liability and property insurance coverage for TGS. It contends it fulfilled that role without any purposeful contacts with the State of Texas. In its special appearance, Anchora argued specifically that: it is not a resident of Texas; it has no systematic and continuous contacts with the State of Texas: it in no manner invoked the benefits and protections of the laws of Texas within the context of this lawsuit; it does not own property, maintain a bank account, or pay taxes in the State of Texas; it has not committed any tort, in whole or in part, within Texas; and it did not purposefully avail itself of the privilege of conducting activities with the forum of Texas. Thus, it contended, any contacts it did have with the State were random, isolated, or fortuitous and could not support a conclusion of purposeful availment on its part.

In response to Anchora's special appearance, TGS argued that the following actions by Anchora constituted purposeful contacts with the State of Texas: (1) contracting with TGS directly, while being aware that TGS would be seeking

insurance in Texas; (2) seeking the services of RPS-Dallas, another Texas resident, in order to have RPS perform services in Texas to effectuate the contractual agreement between Anchora and TGS; (3) receiving financial gain from TGS, when TGS paid Anchora directly and Anchora received commissions; and (4) obtaining a license to sell insurance in Texas. We look at these purported contacts in turn.

(1)     Contracting with TGS, a Texas resident, to place insurance in Texas

It is undisputed that Anchora had no written contract with TGS. However, at the special appearance hearing, counsel for Anchora conceded—as its representative did in deposition—that the two had "an agreement orally that we would help them procure insurance. And we did, in fact, do that." Indeed, Anchora procured general liability insurance for the Texas company and property insurance for its property that was located in Texas. Thus, Anchora certainly agreed to do business with TGS.[6]

(2)     Contracting with RPS-Dallas for Texas services

TGS also contends that Anchora contracted with RPS-Dallas for services that would "effectuate the contractual agreement" between Anchora and TGS. Documents in the record identify RPS as the "broker" in these insurance transactions and identify Anchora as the "Retail Producer." Anchora itself describes RPS as "the

---

[6] The parties' agreement could be characterized as a unilateral contract, which is created "when a promisor promises a benefit if a promisee performs." *City of Houston v. Williams*, 353 S.W.3d 128, 135–36 (Tex. 2011). But whether we clothe the parties' agreement with the title "contract" or not, the existence of that agreement and its performance are significant to our minimum contacts analysis.

conduit between Anchora and the insurance companies where [TGS] placed coverage." The record includes a June 19, 2021 email to TGS representatives from Mr. Smith stating, "Please remember that you cannot bind or alter coverage without speaking to an authorized agent of Anchora Insurance Services, ILC/Mayfieid/Watson Insurance Group, LLC." That "authorized representative" was RPS-Dallas.

Anchora argues first that it "did not directly engage" RPS-Dallas for help in obtaining insurance for TGS. Instead, it states, it was referred to the Dallas RPS office after it initially contacted RPS offices in Georgia. But the fact that Anchora's reaching out to the Dallas office was not its original effort does not in any way make its working relationship with the Dallas office less "direct." The record establishes that Anchora worked directly with Pike and RPS-Dallas in this process.

Similarly, Anchora challenges TGS's charge that it (Anchora) contracted with RPS-Dallas to perform services for Anchora in Texas. Instead, Anchora explains, it has a Retail Producer Agreement "with RPS in Rolling Meadows, Illinois, not Texas." Again, the record establishes that Anchora's first outreach went to RPS's office in Georgia; for the transactions at issue, the record establishes Anchora was dealing with RPS's office in Dallas. Anchora's contract was with the multi-state company and apparently allowed Anchora to work with any of that company's branch offices. What matters here is that Anchora's contacts with RPS in Dallas did,

as TGS contends, allow Anchora to "effectuate" its placement of insurance for TGS in Texas. That fact is not undermined in any fashion by RPS's contractual address.

(3)     Financial gain from Texas activity

Anchora acknowledges that it "did accrue financial benefits—a commission—as a result of the services it provided to [TGS]." But Anchora argues that those benefits were not negotiated or paid directly by TGS. It is undisputed that TGS wrote a check to Anchora, that Anchora deposited TGS's check into its own bank account, and that Anchora then sent 90% of those deposited funds to RPS, keeping 10% as its commission. The multi-layered process by which this insurance was identified, placed, and purchased may well mean that the various entities receive compensation for their services in various ways. But there is no question, based on the record before us, that Anchora received a financial benefit for its role in the process and that its commission was paid by funds from TGS.

(4)     Obtaining a license to sell insurance in Texas

Anchora also concedes the relevant facts for this contact. It states that:

Anchora obtained its license solely for the purpose of legally being able to place insurance on [TGS's] and another client's behalf who was moving from South Carolina to Texas. . . . Anchora only obtained its Texas license so that it would be in compliance with Texas law as a retail non-resident agent.

Anchora acknowledges that it intended to place insurance in Texas for Texas-resident TGS, and that to do so, it was required to obtain a license to sell insurance in this state. Stated differently, Anchora wanted to avail itself of the ability to place

–10–

insurance in Texas, and so it submitted to the requirements of Texas law; it sought, and received, permission to engage in the business of selling insurance in Texas. And it did so, so that it could place the insurance that is at issue in this litigation.[7]

Anchora cites cases from two of our sister courts stating that "[t]he holding of a license to sell services in Texas, without more, does not suffice to establish general jurisdiction." *See Equity Trust Co. v. Hebert*, No. 09-04-122 CV, 2004 WL 2474845, *6 (Tex. App.—Beaumont 2004, no pet.); *see also Int'l Turbine Serv., Inc. v. Lovitt*, 881 S.W.2d 805, 810 (Tex. App.—Fort Worth 1994, writ denied). Because Anchora concedes that it obtained the license to place the insurance at issue in this case, we are viewing its relevance to specific jurisdiction, rather than general jurisdiction. While *Hebert* doesn't specifically address the license in terms of specific jurisdiction, *Lovitt* makes clear that, in that case, "the cause of action was not connected with appellees' Texas insurance license or business. " *Id.* at 809. Accordingly, these cases do not assist our analysis.

In *Shelter Mutual Insurance Co. v. Dallas County Hospital District*, 366 S.W.3d 858, 863 (Tex. App.—Dallas 2012, pet. denied), we addressed Shelter's status as a nonresident insurance company that "maintains a license to do business in Texas and systematically conducts business in Texas with Texas insurance companies." Under the long-arm statute, Texas courts can exercise personal

---

[7] The fact that Anchora had another client moving to Texas—and apparently wanted to be able to place insurance for it as well—does not affect our analysis.

–11–

jurisdiction over a nonresident defendant who "does business" in Texas. Civ. Prac. & Rem. § 17.042. We concluded in *Shelter* that "[r]egardless of the type of policies it actually issues, by seeking and maintaining a license to issue insurance policies in Texas and by actually issuing such policies to Texas companies, Shelter has purposefully availed itself of the benefits of conducting business in Texas." *Id.* As a result, Shelter's contacts were such that it could reasonably foresee being haled into a Texas court. *Id. Shelter* also addressed maintenance of a license to do business as evidence of general jurisdiction. But in this case, where Anchora's principal testifies that the very reason the license was obtained was to be able to place insurance for TGS, we conclude that Anchora's license is a significant contact supporting specific jurisdiction.

Anchora relies on the Texas Supreme Court's opinion in *IRA Resources, Inc. v. Greigo*, 221 S.W.3d 592 (Tex. 2007), to argue that Anchora's contacts with Texas are insufficient to support personal jurisdiction. In that case, Mr. and Mrs. Greigo purchased five Customer Owned Coin Operated Telephones through American Telecommunications Company, Inc. (ATC), as an investment *Id.* at 594. The Griegos' investment agreement provided that ATC's parent company would maintain the phones and the Griegos would receive a guaranteed percentage of revenues. *Id.* at 594–95. To fund the purchase of the telephones, Mr. Greigo rolled an individual retirement account into a self-directed IRA administered by IRA

Resources, a California corporation headquartered in San Diego. *Id.* 595. The supreme court described the nature of that IRA:

> IRA Resources acted as the third-party administrator of Griego's self-directed IRA, providing certain record-keeping services such as issuing quarterly investment performance statements and reporting IRA income to the Internal Revenue Service, but it followed its clients' investment directives and provided no investment advice, recommendations, or endorsements.

*Id.* The supreme court concluded that IRA Resources did not purposefully avail itself of the privilege of conducting business in Texas and determined that the contacts it had with the state were random, isolated, and fortuitous. *Id.* at 598–99. Thus the trial court lacked specific jurisdiction in that case. *Id.* at 599. Anchora argues that its contacts with Texas were similar to IRA Resources, because neither defendant marketed or solicited business in Texas, neither had a Texas bank account or postal box in Texas, and none of its employees traveled to Texas. However, we conclude that *Greigo* is distinguishable in at least one significant respect:  there the supreme court concluded that "merely contracting with and accepting an account-initiation fee from a Texas resident *for services performed in California* are insufficient to satisfy the minimum contacts test." *Id.* at 597 (emphasis added). In appellant's case, the services for which Anchora reached out to TGS and DPS-Dallas, for which it received a commission, and for which it pursued and obtained a Texas license to sell

insurance, were all services to be performed in Texas. We conclude that *Greigo* does not support Anchora's arguments here.[8]

Throughout its briefing, Anchora stresses that it performed all of its services in Georgia, not in Texas. However, our supreme court has stated that "[t]he defendant's activities, whether they consist of direct acts within Texas *or conduct outside Texas*, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *M & F Worldwide Corp.*, 512 S.W.3d at 886 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)) (emphasis added). Although Anchora remained physically in Georgia, we conclude that it reached out to a Texas resident and agreed to place insurance for that resident, including insurance on the resident's Texas property. In the process, it worked with the Texas branch office of its broker to act as a conduit between Anchora and companies that would insure the Texas business and property. For its efforts, it received a commission that was paid from TGS's funds. And all of its activities were made possible because it obtained a license from the State of Texas to sell insurance, i.e., to do business in Texas.

---

[8] Anchora relies on a second case involving IRA Resources for its argument that "there can be no specific jurisdiction when the defendant's services find their way into the forum through a separate entity." It cites *Meader v. IRA Resources, Inc.*, 178 S.W.3d 338, 347 (Tex. App.—Houston [14th Dist.] 2005, no pet.) for that proposition, arguing that because Anchora was originally contacted by Five on Fifty, jurisdiction in this case would be improper. The contacts on which our analysis is based are Anchora's contacts, not Five on Fifty's. The fact that Anchora's work for TGS was originally sought out by another entity is irrelevant to Anchora's contacts with TGS and Texas.

These contacts were Anchora's. Each of them was part of Anchora's purposeful business venture into Texas to place specific insurance for a specific client, i.e., TGS. Accordingly, the contacts cannot be described as random or isolated or fortuitous. In addition, Anchora unquestionably profited from this business venture. Accordingly, we conclude that Anchora purposefully availed itself of the privilege of doing business in Texas. *See Moki Mac*, 221 S.W.3d at 575. We conclude Anchora had minimum contacts with the State of Texas sufficient to support specific jurisdiction over it. We overrule Anchora's first issue.[9]

*Due Process*

In its third issue, Anchora contends that the trial court erred by denying its special appearance when the facts show that exercising personal jurisdiction over it in this case would violate due process. Even if a nonresident has established minimum contacts with a state, jurisdiction may only be exercised over the nonresident if doing so comports with traditional notions of fair play and substantial justice. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 55 (Tex. 2016). The Texas Supreme Court has identified factors that may be relevant to this inquiry, including the burden on the defendant, the interests of the forum in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 74 (Tex.

---

[9] Because we conclude that Anchora's contacts support specific jurisdiction, we need not address its second issue challenging general jurisdiction.

–15–

2016). That court has also recognized that if "a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with [such] notions." *Id.* (quoting *Moncrief Oil Intern. Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154–55 (Tex. 2013)).

Subjecting Anchora to suit in Texas may impose some burden upon it, but the same can be said of all nonresidents. "Distance alone cannot ordinarily defeat jurisdiction." *Moncrief Oil*, 414 S.W.3d at 155. Anchora does not identify any burden peculiar to this case, or its circumstances, that speaks to any compelling hardship beyond the distance between Georgia and Texas.

We are also persuaded that Texas has a compelling interest in adjudicating this lawsuit, which will resolve claims of bad faith insurance practices that purportedly resulted in millions of dollars in damages to a Texas resident and Texas property. "The State of Texas has a special interest in regulating certain areas such as insurance, and the Texas courts have implicitly recognized the role of that interest for purposes of determining personal jurisdiction." *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 229 (Tex. 1991). Moreover, contrary to Anchora's assertion in its brief, TGS *is* asserting that Anchora committed torts in Texas. *See Moncrief Oil*, 414 S.W.3d at 155 (allegations that defendants committed tort against resident in Texas "implicate a serious state interest in adjudicating the dispute").

Finally, while we do not question the ability of the South Carolina courts to adjudicate TGS's claims against Anchora, if TGS's claims against all other defendants are being pursued in a single case in Texas, efficiency argues for its claims against Anchora being adjudicated as part of that single process.

We conclude that each of the *Cornerstone Healthcare* factors supports the trial court's exercising jurisdiction over Anchora. Accordingly, we conclude that exercising that jurisdiction will comport with traditional notions of fair play and substantial justice. *See Ruiz*, 490 S.W.3d at 55. We overrule Anchora's third issue.

## Conclusion

We affirm the trial court's August 1, 2022 Order Denying Special Appearance.

220833f.p05

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANCHORA INSURANCE
SERVICES, LLC, Appellant

No. 05-22-00833-CV     V.

TEXAS GREEN STAR
HOLDINGS, LLC, Appellee

On Appeal from the County Court at
Law No. 1, Dallas County, Texas
Trial Court Cause No. CC-21-04851-
A.
Opinion delivered by Justice
Pedersen, III. Justices Molberg and
Miskel participating.

In accordance with this Court's opinion of this date, the trial court's August 1, 2022 Order Denying Special Appearance is **AFFIRMED**.

It is **ORDERED** that appellee Texas Green Star Holdings, LLC recover its costs of this appeal from appellant Anchora Insurance Services, LLC.

Judgment entered this 11th day of July, 2023.