**Opinion issued December 29, 2020**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-19-00607-CV

———————————

**PETROSAUDI OIL SERVICES LTD., Appellant**

**V.**

**WILLIAM HARTLEY, Appellee**

---

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-03171**

---

## O P I N I O N

In this interlocutory appeal, William Hartley, a welder, sued PetroSaudi Oil

Services, Ltd. (PetroSaudi), among other defendants, under the Jones Act for injuries

he allegedly received while working on the M/V PetroSaudi Saturn, a drillship that

was anchored off the coast of Trinidad and Tobago. PetroSaudi filed a special appearance, asserting that it was a nonresident of Texas and that Texas courts could not exercise personal jurisdiction over it consistent with due process guarantees. The trial court denied PetroSaudi's special appearance. In three related issues, PetroSaudi argues that: (1) it did not waive its special appearance; (2) the jurisdictional evidence is not legally and factually sufficient to support the trial court's exercise of personal jurisdiction over it; and (3) its Houston-based subsidiary corporation is not its alter ego, and therefore that company's contacts with Texas cannot be imputed to PetroSaudi.

We affirm.

## Background

Hartley, a Louisiana resident, is a welder. On May 1, 2015, he was working on the M/V PetroSaudi Saturn, a drillship anchored off the coast of Trinidad and Tobago. Hartley alleges that he was seriously injured while carrying a large piece of steel across the vessel. Specifically, he alleges that, as he lowered the piece of steel to the deck, "he felt a knife-like sensation in his groin," and he had to be transported to a hospital onshore, where he underwent surgery for a hernia. He alleges that his "current injuries include, but are not limited to, a right-side inguinal hernia, as well as pain in his neck, back, bilateral buttocks, and left foot."

On January 17, 2018, Hartley filed suit against several defendants: Spencer Ogden, Inc., Spencer Ogden, Inc. *d/b/a* Spencer Ogden USA Inc., Procurement Services (Delaware) Inc., and the appellant here, PetroSaudi Oil Services Ltd.[1] Hartley asserted negligence and gross negligence claims under the Jones Act. He alleged that his injuries were caused by the defendants' breach of their duty to provide a seaworthy vessel, and he alleged that, because he was injured while in the service of the vessel, the defendants owed him a non-delegable duty to provide him with the benefits of maintenance and cure.

Hartley alleged that two of the Spencer Ogden entities—Spencer Ogden, Inc. and Spencer Ogden, Inc. *d/b/a* Spencer Ogden USA Inc.—were Texas corporations with their principal places of business in Houston, and he alleged that Procurement Services (Delaware) Inc. was a Delaware corporation with its principal place of business in Houston. He alleged the following with respect to PetroSaudi:

> Defendant PetroSaudi Oil Services Ltd, is a foreign company doing business within the State of Texas for the purpose of accumulating monetary profit, that is at home in the State of Texas. This Defendant holds itself out as doing business in the State of Texas at, and operates out of an office and conducts business via Procurement Services (Delaware) Inc. This Defendant was the owner, operator and/or manager of the vessel on which [Hartley] was working . . . at the time of his injuries.

---

[1] Hartley amended his petition in May 2018 and added claims against two additional entities: Spencer Ogden International Ltd. and Saturn Drillships Pte Ltd. Hartley later nonsuited his claims against these two companies. Neither of these defendants is a party to this interlocutory appeal.

Hartley alleged, alternatively, that PetroSaudi was registered in the Cayman Islands and did not maintain a principal office in Texas.

Hartley also alleged that the trial court could exercise personal jurisdiction over all of the defendants. Specifically, he alleged:

> Plaintiff's claims and causes of action arise out of, are related to or are connected with each defendant's contacts with the State of Texas and enable this Court to exercise specific personal jurisdiction over Defendants without violating any defendant's due process rights under the United States Constitution. Such minimum contacts with the State of Texas supporting the exercise of specific personal jurisdiction over Defendants include, but are not limited to, the following. PetroSaudi Oil Services Ltd. has an office located at [an address on the North Sam Houston Parkway in Houston]. PetroSaudi Oil Services Ltd. contracted with Griffin, a Houston-based company providing travel solutions to the energy industry, for travel used by the Plaintiff [after his injury]. PetroSaudi Oil Services Ltd. through the use of an agent and/or an intermediary solicits, hires, and employs a variety of workers on its offshore vessel through a company located in Houston, Harris County, Texas: Defendant Spencer Ogden Inc. PetroSaudi Oil Services Ltd. contracted with Houston-based Defendant Spencer Ogden Inc. to provide both training to Plaintiff and the services of qualified medics to perform emergency medical treatment. As such, this Court has specific jurisdiction or in the alternative, the quality and characteristics of both Defendants' contacts should deem them to be "at home" in the State of Texas.

Hartley alleged that both PetroSaudi and Procurement Services have an office at the same address in Houston. Hartley also alleged that the trial court could exercise personal jurisdiction over PetroSaudi on an alter ego theory, alleging that PetroSaudi controls the actions of Procurement Services to the degree that they are not separate and distinct corporate entities. He alleged that Procurement Services is "at home" in

4

Texas because its principal office is located in Houston, and he alleged that Procurement Services' contacts with Texas can be imputed to PetroSaudi.

PetroSaudi filed a special appearance on July 18, 2018, which it amended three times: on July 30, 2018, on September 11, 2018, and on February 26, 2019. It argued that it lacked sufficient minimum contacts with Texas to support the exercise of either general or specific personal jurisdiction, and it argued that Hartley's jurisdictional allegations in his petition were conclusory and failed to bring PetroSaudi within the scope of the Texas long-arm statute. PetroSaudi also argued that, even if it did have sufficient minimum contacts with Texas, exercising personal jurisdiction over it would offend traditional notions of fair play and substantial justice. Specifically, PetroSaudi argued that "[n]one of the events giving rise to this litigation occurred in Texas," that Hartley was a resident of Louisiana and had not sought medical treatment in Texas, and that no relevant medical or fact witnesses resided in Texas.

PetroSaudi attached the verification of its president, Timothy Myers, who averred that PetroSaudi was incorporated in the Cayman Islands; that it does not have an agent for service of process in Texas; that it does not have any shareholders, officers, or directors who are Texas residents; that it has never maintained an office in Texas; that it has never been licensed to do business in Texas; that it does not solicit business in Texas; that it has never owned, rented, or leased any real or

personal property in Texas; that it has never maintained business records in Texas; that it has never conducted banking business, "record keeping functions," accounting work, or administrative functions in Texas; it has never had a shareholders' or directors' meeting in Texas; it has never applied for a loan or acted as a guarantor on a bank loan in Texas; it has never paid franchise taxes in Texas or filed an income tax return in Texas; it has never published advertisements in Texas; and it has never initiated any litigation in Texas.

Myers also averred that PetroSaudi "has never managed or operated the *M/V PetroSaudi Saturn*, a Singapore-flagged drill ship that has never operated from any port in Texas"; it has never chartered the vessel to a Texas company; it has never entered into a drilling contract with a Texas company; and it has never "been awarded work through companies with offices located in Texas for work to be performed in whole or in part within the State of Texas." Myers averred that PetroSaudi "sends employees to Texas for initial ISM training and certification, and occasionally sends employees to Texas to attend other training courses, typically at the request of the employee involved." Myers further averred that none of the acts complained of by Hartley occurred in Texas.

The parties conducted jurisdictional discovery, which included taking the depositions of Myers and several employees of Procurement Services. PetroSaudi filed its third amended special appearance in February 2019 and attached additional

6

evidence in support. This evidence included excerpts from Myers' deposition. Myers testified concerning the corporate structure of the PetroSaudi family of companies and the role that each company plays. PetroSaudi Oil International is the parent company of PetroSaudi Oil Services, which is the parent company of Procurement Services, an entity that "provided services to other entities in the group," and PetroSaudi Oil Services (Venezuela) Ltd., an entity that was responsible for managing and operating the M/V PetroSaudi Saturn. Myers testified that he is PetroSaudi's only employee and he works in London. He described the companies' functions as follows:

> I'm PetroSaudi Oil Services, Ltd., I'm looking out for—let PetroSaudi (Venezuela) run the rig. Procurement Services here in Houston does its thing procuring, supporting Venezuela. My PetroSaudi Oil Services hat, I'm looking for new business opportunities . . . which would be, you know, anywhere in the world.

He testified that he is a director of both Procurement Services and PetroSaudi (Venezuela), but he does not "get involved in the daily activities" of Procurement Services, that he has "minimal" involvement with that office, and that the employees of Procurement Services "pretty much run themselves," although they do ultimately report to him.[2]

---

[2]     Myers also testified that, after the M/V PetroSaudi Saturn was shut down in late 2017 or early 2018, Procurement Services closed its Houston office, and the remaining employees continued working on a contract basis from their homes.

Myers testified that a Charter Agreement existed between Saturn Drillships Pte Ltd., which owned the vessel, and PetroSaudi (Venezuela), which operated the vessel, but PetroSaudi did not have any contracts with either PetroSaudi (Venezuela) or Procurement Services. Myers was asked during his deposition whether some of the people who worked on the vessel were employed by PetroSaudi, and he responded:

> A handful, yes. And that was more of an administrative error. Up to a certain point, they were all PetroSaudi (Venezuela). There were some personnel changes, and someone on the form had accidentally put PetroSaudi Oil Services, Ltd. . . . Basically, I mean, it was—it was just an employment contract, and it just happened to say PetroSaudi Oil Services, Ltd. They were treated just like all the other employees of PetroSaudi (Venezuela). It was just a—I would call it a typo in a document.

Myers acknowledged that some of the individuals working on the vessel were Texas residents. Myers testified that "PetroSaudi (Venezuela) via Procurement Services" provided supplies and support for the vessel, and "PetroSaudi (Venezuela) would then pay Procurement Services for having provided that good or service." With regard to personnel for the vessel, PetroSaudi (Venezuela) would inform Procurement Services of the different positions for which it needed crew. Procurement Services would then contract with staffing companies, such as Spencer Ogden, the company that hired Hartley, to provide qualified personnel. Procurement Services paid Spencer Ogden based on a specified rate, and Spencer Ogden would then pay the individual.

8

Myers testified that PetroSaudi never rented or leased any real or personal property in Texas, but Procurement Services leased office space in Houston. He stated that PetroSaudi did not have any employees in Houston. During his deposition, Myers was asked about the email addresses, signature blocks, and LinkedIn profiles of several Procurement Services employees. Each of these employees had an email address with a PetroSaudi.com domain name. The email signature blocks of each of these employees stated "PetroSaudi Oil Services, Ltd" and then listed the North Sam Houston Parkway address in Houston, and each of these employees listed PetroSaudi Oil Services as their employer on their LinkedIn profile. Myers testified that all employees in the PetroSaudi family of companies used the same domain name for their email addresses. He testified that he did not know why the employees, in their email signature blocks and on their LinkedIn profiles, stated that they were PetroSaudi employees because they were Procurement Services employees, and he stated that he did not tell the employees to use PetroSaudi's name in this manner.

PetroSaudi also attached excerpts from the deposition of Chris Hudson, Procurement Services' Technical and Marine Manager, who was responsible for, among other things, maintaining all regulatory requirements for the vessel and making sure all maintenance on the vessel was performed timely and properly. He testified that he had held this position with Procurement Services since May 2014

and that he has never been employed by PetroSaudi Oil Services. Hudson acknowledged that he had testified differently in a deposition for a prior personal injury case in which Procurement Services was a defendant.[3] Hudson testified that Myers is the only employee of PetroSaudi who he knows of; and when Hudson was asked what PetroSaudi does, he stated, "I'm not sure what PetroSaudi Oil Services does now that we're separating it from Venezuela [PetroSaudi (Venezuela)]. I just always kind of lumped them in." He stated that specific orders and assignments for workers on the vessel would come from PetroSaudi (Venezuela). Hudson testified that he did not know anything about the capitalization of Procurement Services and that its only assets were "some desks and some chairs, and that's about it."

Nysia Gaskin, Procurement Services' former Human Resources Manager, testified that Procurement Services would contract with staffing companies like Spencer Ogden to obtain personnel to perform work on the vessel when it was docked in places like Panama or Trinidad and Tobago. She stated that, to staff the vessel, PetroSaudi (Venezuela) would tell her what positions it needed filled and

---

[3]    In the deposition for the underlying case, Hudson testified that he understood the question asked of him in the deposition in the prior case to be about what he was doing in Panama, where the plaintiff's injury had occurred. Hudson testified that he stated, "I get a paycheck from Procurement Services, and I was down there managing a project for PetroSaudi." He further testified that when he received a copy of his deposition testimony to review, there was a mistake, but he was told that he could not change his testimony. Hartley attached a copy of Hudson's deposition from the prior case as an exhibit to his response to PetroSaudi's special appearance. In that deposition, Hudson stated that his current employer was PetroSaudi and that he had been working there since May 2014.

where the vessel was located, and depending on that information, Gaskin would "go out and source not just Spencer Ogden but whoever we had actual service agreements with and see who can get me the best labor at the best price with the right credentials in a timely manner." Gaskin testified that she believed that anyone who was hired in this manner was an employee of Spencer Ogden; she stated that these individuals were not employees of Procurement Services. Spencer Ogden would invoice Procurement Services for payment of the workers, and Procurement Services' accounting department would verify the individual's hourly rate and handle payment to Spencer Ogden, which would then pay the worker. Gaskin testified that the contract under which Hartley was hired was between Spencer Ogden and PetroSaudi (Venezuela).

In response to PetroSaudi's special appearance, as amended, Hartley argued that PetroSaudi "undeniably conducts business" in Texas. He argued that this business included having an office in Houston; holding training sessions for employees in Houston; having a management team, a crewing manager, and a human resources manager all located in Houston; and "performing work directly related to the services provided by Hartley in Houston." He argued that the invoices sent by Spencer Ogden for payment for his services were sent to "PetroSaudi's Houston office." These invoices, which Hartley attached as exhibits to his response, were addressed to "PetroSaudi Oil Services Ltd." and then stated an address on the North

11

Sam Houston Parkway in Houston—the same address that Procurement Services used. Hartley also attached other documents addressed to "PetroSaudi Oil Services Ltd." that had the Houston address, including emails from Procurement Services personnel that stated "PetroSaudi Oil Services Ltd" and the Houston address in the signature block, travel documentation for Hartley's return trip to the United States following his injury, and compliance documents for the vessel's "Safety Management Certificate" and "International Ship Security Certificate."[4]

Hartley also attached an email sent in September 2017 by Gaskin on behalf of Myers to a list of undisclosed recipients. This email was entitled "PetroSaudi Oil Services Town Hall Conference call script" and summarized an earlier conference call that Myers had had with employees. Myers informed the employees that "[their] current contract with PDVSA ends on November 7th this year [2017]," that Myers "and the Executive Team in London have done their [utmost] to secure a contract extension in Venezuela," but because that did not appear likely, "the lack of business prospects is likely to result in a restructuring of the business." Myers stated that if a contract extension could not be secured, the vessel would sail to Trinidad—where

---

[4] Hartley also attached Myers' complete deposition as an exhibit to his special appearance response. In his deposition, Myers speculated that the reason Spencer Ogden addressed its invoices for Hartley's work in this manner was because Brian Davis, Procurement Services' Crewing Manager, stated, in his email signature block, that he worked for PetroSaudi Oil Services and listed the Houston address. Myers speculated that the same thing occurred with the organization that completed the vessel's required certificates.

12

the onboard equipment would be dismantled—and then on to Turkey to be sold for scrap. Myers stated, "Regrettably this would have an impact on your employment with the Company and although the HR team are looking at this on an individual role basis I can provide some overall direction on what this is likely to look like." Myers stated:

> For onshore employees including the Houston and Venezuelan offices who are needed to closeout operations/offices, terminations are likely to take place at the start of December. This could mean from now until then the officer workers will work towards closing out items relating to the [vessel] and the offices.
>
> Once a more concrete plan is in place the HR team will be in a position to communicate with each employee individually on their expected termination date. Please understand that this may take some time.
>
> It brings me great disappointment to have to deliver this news. I am immensely proud of Oil Services who have worked tirelessly over the years to perform the best job possible given the very difficult working environment. We should all be proud of what we have achieved and it is with regret that things did not turn out differently and I have had to communicate such news today.
>
> I will be flying to Houston next week to work with the management team to make more detailed plans. We will continue to keep you updated on any changes.

Gaskin's email signature block identified her title—Human Resources Manager—and stated "PetroSaudi Oil Services Ltd." and the North Sam Houston Parkway address.

Hartley also argued that PetroSaudi hired at least two Texas residents to work on the M/V PetroSaudi Saturn, and he attached copies of these individuals'

13

employment agreements, which were entitled "PetroSaudi Oil Services Ltd (The "Company") Employment Agreement" and which listed Houston as the employee's "Point of Origin." He further argued that PetroSaudi recruited Texas residents to work on the vessel through both Procurement Services and Spencer Ogden and that this constituted doing business in Texas. He argued that the trial court could exercise general jurisdiction over PetroSaudi because it maintained an office in Texas and therefore should be considered "at home" in this state. Alternatively, he argued that PetroSaudi was subject to specific jurisdiction because it "relied on a Houston-based company to extend an offer of employment to [Hartley] from a Houston address," "the Houston company invoiced PetroSaudi at its Houston address," and "[i]t was during this period of employment after being recruited by a Houston company that [Hartley] suffered his injuries while working for PetroSaudi."

Hartley then argued that Procurement Services was an alter ego of PetroSaudi and its contacts with Texas could be imputed to PetroSaudi, pointing out that Procurement Services was a wholly-owned subsidiary of PetroSaudi; Procurement Services performed numerous functions for PetroSaudi but no contracts existed between the companies; PetroSaudi submitted requisitions to Procurement Services when the vessel needed supplies or personnel; Myers served as president of PetroSaudi and as a director of Procurement Services; Procurement Services ultimately reported to Myers; Procurement Services had little in the way of assets;

14

the companies shared a domain name; and Procurement Services employees stated that they worked for PetroSaudi in their email signature blocks and LinkedIn profiles.

Hartley also attached the full deposition of Chris Hudson. When asked to explain the relationship between PetroSaudi Oil Services and Procurement Services, Hudson testified:

> Well, the way I understand it . . . is that PetroSaudi Oil Services is the one that was running the show in Venezuela. They are the ones that liaised with Pedevesa and the Venezuelans; and they provided the drill crews onboard, is the way I understand it.
>
> Procurement Services, what we did was, if they needed materials, they submitted requisitions; if they needed services, they submitted requisitions; and our procurement manager would look for whatever they [were] asking for. And if it was, "We need lube oil," she would find lube oil and have it sent down there to them.
>
> Procurement Services arranged whatever they asked—whatever they needed, we arranged it.

Hudson testified that, at the time of the incident that formed the basis of the previous personal injury lawsuit involving Procurement Services, he "was down there on behalf of" PetroSaudi (Venezuela), but at the time he gave his deposition for that prior case, he "was lumping everybody together. PetroSaudi Oil Services was everybody outside Procurement Services, as far as I was concerned." He testified, "I do not now, nor have I ever, worked for . . . PetroSaudi Oil Services or PetroSaudi

Oil Services Venezuela." He stated that, instead, he had worked for Procurement Services since May 2014.[5]

On June 5, 2019, Hartley moved to strike PetroSaudi's special appearance. Hartley pointed out that, although PetroSaudi originally filed its special appearance in July 2018, it amended its special appearance three times, did not set it for a hearing until March 2019, passed the hearing after Hartley filed a response, and had not reset the special appearance for a hearing. Hartley also pointed out that PetroSaudi had refused to participate in merits-based discovery and that, while it had filed a motion to quash and motion for a protective order related to this discovery, it had failed to obtain the court's ruling on these motions. Hartley argued that by failing to have its special appearance heard by the court for over ten months PetroSaudi had waived its special appearance.

PetroSaudi filed a reply and continued to argue that it did not have an office in Texas and that it was not subject to personal jurisdiction in this state. As additional evidence, PetroSaudi attached the affidavit of Alejandro Aguero, who was Procurement Services' Commercial Finance Manager and a director from April 2017 through April 2019. Aguero averred that PetroSaudi was a Cayman Islands

---

[5] Hartley also attached the full transcript from Hudson's deposition in the prior lawsuit. In that deposition, Hudson was asked, "Has there ever been a point in time where you've been a direct employee of Procurement Services?" Hudson answered, "No."

16

corporation and that it was his understanding that PetroSaudi "never maintained an office in Texas, and it certainly never maintained an office here during the time [he] worked for" Procurement Services. He averred:

> [Procurement Services] provided services and procured materials, labor and third-party services on an as-needed basis exclusively for PetroSaudi entities, but primarily for [PetroSaudi (Venezuela)]. The services it provided included, among other things, arranging for PetroSaudi employees to attend various training seminars and courses in Texas and elsewhere, arranging and booking airfare for those employees, arranging air travel for employees and contractors, including contract laborers, to and from projects, such as the maintenance work on the only remaining PetroSaudi drillship, *PETROSAUDI SATURN*.

Aguero averred that Procurement Services was responsible for obtaining the required safety certifications for the vessel, and although the certifications were sent to Procurement Services' office, "those certifications named [PetroSaudi Oil Services] because it was the PetroSaudi entity that was responsible for the adequacy of the safety management protocol for the *SATURN*." Aguero averred that the certifications were sent to Procurement Services' Houston office because two Procurement Services employees worked with the issuing organization "in getting those audit certifications issued on behalf of [PetroSaudi Oil Services]."

Aguero also averred that Procurement Services arranged for contract laborers on the vessel, "and while [PetroSaudi (Venezuela)] coordinated the timing of their arrivals and departures, [Procurement Services] would arrange for their payments."

17

He averred that Procurement Services prepared the contract between PetroSaudi (Venezuela) and Spencer Ogden, pursuant to which Hartley was hired. He averred:

> In the case of Mr. Hartley, Spencer Ogden sent invoices to our office to the attention of [PetroSaudi Oil Services], even though Spencer Ogden entered into an agreement with [PetroSaudi (Venezuela)] for Mr. Hartley's work. I believe the invoices were issued in this manner because Brian Davis, a [Procurement Services] contract employee who was the Crewing Manager . . . , used the [PetroSaudi Oil Services] name in his email signature block, and Spencer Ogden sent them to [Procurement Services] for payment using the information shown in Mr. Davis's email.

He further averred that, after Hartley's injury, Procurement Services made arrangements for Hartley's return to the United States "on behalf of" PetroSaudi (Venezuela), "although the tickets were issued in the name of our parent company, [PetroSaudi Oil Services]." Aguero speculated that because these arrangements were made with Davis's assistance, "the vendor or others merely referred to his name and address on his emails when making these flight reservations." Aguero also addressed employment contracts for two individuals working on the vessel that were "mistakenly prepared by [Procurement Services] in [PetroSaudi Oil Services'] name instead of in [PetroSaudi (Venezuela)'s] name," which Aguero described as an error because PetroSaudi had no responsibility for manning the vessel—that was PetroSaudi (Venezuela)'s responsibility.

Aguero also discussed the financing and control of Procurement Services. He averred:

18

[Procurement Services] generated no income and was funded by [PetroSaudi (Venezuela)]. [Procurement Services] entered into an intercompany Services Agreement with [PetroSaudi (Venezuela)] whereby [Procurement Services] provided agreed-upon services for compensation to [Procurement Services] that included the costs of its office space and related expenses, employee salaries, bonuses and benefit programs, travel expenses, and all other costs and expenses incidental to [Procurement Services'] provision of services to [PetroSaudi (Venezuela)]. This agreement was in effect during the time the *PETROSAUDI SATURN* was in drydock in Panama, and later at the time of the incident forming the basis of Mr. Hartley's lawsuit. . . .

The [Procurement Services] office was run by its employees without any day-to-day supervision by [PetroSaudi Oil Services]. We instituted our own procedures, set our own schedules and remained individually responsible for accomplishing the work needed for other PetroSaudi entities. We entered into agreements with vendors and other third parties in the maintenance of our Houston office and the accomplishment of our procurement function.

Aguero also averred that some of Procurement Services' employees used "PetroSaudi Oil Services" in their email signature blocks and LinkedIn profiles "because [PetroSaudi Oil Services] is [Procurement Services'] parent company" and "[t]he use of [PetroSaudi Oil Services'] name was no more than a matter of branding than anything else." He averred that none of Procurement Services' employees were instructed by PetroSaudi Oil Services to use the PetroSaudi name in that manner.[6]

In a separate filing, PetroSaudi responded to Hartley's motion to strike its special appearance and argued that it had not waived its special appearance.

---

[6] PetroSaudi also attached the affidavit of Nysia Gaskin, and this affidavit contained essentially the same facts as Aguero's affidavit.

19

PetroSaudi pointed out that, although the special appearance had been pending for nearly a year, the trial court had not entered any merits-based rulings against PetroSaudi. It also noted that, while Texas Rule of Civil Procedure 120a contained due-order-of-pleading and due-order-of-hearing requirements, it contained no requirement that a special appearance must be heard within a particular time frame or else it is waived.

After a hearing, the trial court denied PetroSaudi's special appearance without stating a reason for its ruling. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (providing that party may take interlocutory appeal from order denying special appearance).

## Special Appearance

In three related issues, PetroSaudi challenges the trial court's denial of its special appearance. In its first issue, it argues that it did not waive its special appearance. In its second issue, it argues that the evidence is legally and factually insufficient to support the trial court's exercise of personal jurisdiction over it. And in its third issue, it argues that Procurement Services is not its alter ego, and therefore Procurement Services' contacts with Texas cannot be imputed to PetroSaudi.

### A.    *Standard of Review*

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*,

20

549 S.W.3d 550, 558 (Tex. 2018); *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017). In resolving this legal question, however, the trial court must frequently resolve questions of fact. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). When, as here, the trial court does not issue findings of fact and conclusions of law relating to its decision on a special appearance, we imply all relevant facts necessary to support the judgment that are supported by evidence. *Bell*, 549 S.W.3d at 558; *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). We presume that the trial court resolved all factual disputes in favor of its judgment. *Coleman*, 83 S.W.3d at 806. If the appellate record includes the reporter's record and the clerk's record, the trial court's implied findings are not conclusive, and they may be challenged for legal and factual sufficiency of the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Washington DC Party Shuttle, LLC v. IGuide Tours, LLC*, 406 S.W.3d 723, 729 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). On appeal, the scope of review includes all of the evidence in the record. *Washington DC Party Shuttle*, 406 S.W.3d at 729.

We review the challenged factual findings by using the same standards that we use to review jury findings. *Id.* When reviewing a finding for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *Id.* (citing *City of Keller*

21

*v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We credit favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* Evidence is legally insufficient to support the implied finding only if: (1) there is a complete absence of evidence of a vital fact; (2) we are barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.*

In reviewing the factual sufficiency of the evidence supporting implied findings, we consider all of the evidence, and we will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* We may not substitute our judgment for that of the factfinder or pass upon the credibility of the witnesses. *Watamar Hldg. S.A. v. SFM Hldgs., S.A.*, 583 S.W.3d 318, 325 (Tex. App.—Houston [14th Dist.] 2019, no pet.). If the evidence supports the implied fact findings, we must uphold the trial court's judgment on any legal theory supported by the findings. *Washington DC Party Shuttle*, 406 S.W.3d at 729; *Watamar Hldg.*, 583 S.W.3d at 325–26 ("The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment.").

## B. *Exercise of Personal Jurisdiction*

Texas courts may exercise personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with state and federal due-process guarantees. *Bell*, 549 S.W.3d at 558 (quoting *Moncrief Oil Int'l*, 414 S.W.3d at 149). The long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas. *BMC Software*, 83 S.W.3d at 795. Under the long-arm statute, a nonresident does business in Texas if, "[i]n addition to other acts that may constitute doing business," the nonresident (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in Texas; (2) commits a tort in whole or in part in Texas; or (3) recruits Texas residents, directly or through an intermediary located in Texas, for employment inside or outside of Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Bell*, 549 S.W.3d at 558–59.

To establish personal jurisdiction over a nonresident defendant, federal due process standards require that the defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Bell*, 549 S.W.3d at 559 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A defendant establishes minimum contacts with a forum state when it "purposefully avails itself of the

23

privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The defendant's activities "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Bell*, 549 S.W.3d at 559; *Retamco Operating*, 278 S.W.3d at 338; *see TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) ("Due process requires purposeful availment because personal jurisdiction 'is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there.'") (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

When determining whether a defendant has purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Bell*, 549 S.W.3d at 559 (quoting *Moncrief Oil Int'l*, 414 S.W.3d at 151); *TV Azteca*, 490 S.W.3d at 38 (stating that defendant's contacts must be "purposefully directed" to Texas and "must result from the defendant's own 'efforts to avail itself of the forum'") (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays,*

*P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991), and *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007)). A nonresident may purposefully avoid jurisdiction "by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana Easy Livin' Country*, 168 S.W.3d at 785. We assess the quality and the nature of the contacts, not the quantity. *TV Azteca*, 490 S.W.3d at 38.

A defendant's contacts with the forum may give rise to either general or specific jurisdiction. *Bell*, 549 S.W.3d at 559; *M & F Worldwide*, 512 S.W.3d at 885. General jurisdiction, on which we base our decision, "involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *M & F Worldwide*, 512 S.W.3d at 885 (quoting *PHC-Minden, LP v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007)); *see Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) ("A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State."). General jurisdiction is established when a defendant's affiliations with the state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *M & F Worldwide*, 512 S.W.3d at 885 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *Searcy v. Parex Res.,*

*Inc.*, 496 S.W.3d 58, 72 (Tex. 2016) ("[G]eneral jurisdiction relies on the defendant itself being tied up—almost entangled in a web—with the forum state.").

For a corporation the "paradigm" forums for the exercise of general jurisdiction are the place of incorporation and its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *see Bristol-Myers Squibb*, 137 S. Ct. at 1780 ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.") (quoting *Goodyear Dunlop Tires Operations*, 564 U.S. at 924). "The exercise of general jurisdiction is not limited to these forums; in an 'exceptional case,' a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler AG*, 571 U.S. at 139 n.19); *Searcy*, 496 S.W.3d at 72 ("Continuous and systematic contacts that fail to rise to this relatively high level are insufficient to confer general jurisdiction over a nonresident defendant.").

The general jurisdiction inquiry "does not focus solely on the magnitude of the defendant's in-state contacts." *BNSF Ry.*, 137 S. Ct. at 1559 (quoting *Daimler AG*, 571 U.S. at 139 n.20). Instead, "the inquiry 'calls for an appraisal of a corporation's activities in their entirety" because "'[a] corporation that operates in many places can scarcely be deemed at home in all of them.'" *Id.* (quoting *Daimler*

*AG*, 571 U.S. at 139 n.20). The Texas Supreme Court has held that if a nonresident corporation owns a subsidiary located in Texas, "this ownership is not *ipso facto* sufficient to confer jurisdiction over the nonresident owner itself." *Searcy*, 496 S.W.3d at 72. "Courts do not have general jurisdiction over corporate defendants that are neither incorporated in the forum state nor have their principal place of business there, absent some relatively substantial contacts with the forum state." *Id.*

When personal jurisdiction is challenged, the plaintiff and the nonresident defendant bear shifting burdens of proof. *Bell*, 549 S.W.3d at 559; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the scope of Texas's long-arm statute. *Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658. The trial court may consider the plaintiff's original pleadings as well as his response to the defendant's special appearance in determining whether the plaintiff satisfied his initial burden. *Predator Downhole Inc. v. Flotek Indus., Inc.*, 504 S.W.3d 394, 402 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.). If the plaintiff fails to plead facts bringing the defendant within the reach of the long-arm statute, "the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly*, 301 S.W.3d at 658–59. In conducting our review, we accept as true the allegations in the petition. *Touradji*, 316 S.W.3d at 23.

27

If the plaintiff meets its initial pleading burden, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Bell*, 549 S.W.3d at 559; *Kelly*, 301 S.W.3d at 658 ("Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading."). The defendant can negate jurisdiction on either a factual or a legal basis. *Kelly*, 301 S.W.3d at 659. Factually, the defendant can present evidence that it has no contacts with Texas, "effectively disproving the plaintiff's allegations." *Id.* The plaintiff can then respond with its own evidence affirming its allegations, and if it does not present evidence establishing personal jurisdiction, it risks dismissal of its suit. *Id.* Legally, the defendant can show that, even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas do not constitute purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts with Texas; or that the exercise of jurisdiction offends traditional notions of fair play and substantial justice. *Id.*

If the defendant negates the plaintiff's jurisdictional allegations, the plaintiff must respond with evidence that establishes "the requisite link with Texas." *TMX Fin. Hldgs., Inc. v. Wellshire Fin. Servs., LLC*, 515 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) (quoting *Kelly*, 301 S.W.3d at 660). Once the defendant has produced credible evidence negating all bases of jurisdiction, the

plaintiff then bears the ultimate burden to establish that Texas courts can exercise personal jurisdiction over the defendant as a matter of law. *Id.* (quoting *Vak v. Net Matrix Sols., Inc.*, 442 S.W.3d 553, 558 (Tex. App.—Houston [1st Dist.] 2014, no pet.)); *Predator Downhole*, 504 S.W.3d at 402.

## C.   *Waiver of Special Appearance*

Texas Rule of Civil Procedure 120a governs special appearances. It provides:

1.    [A] special appearance may be made by any party either in person or by attorney for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such party or property is not amenable to process issued by the courts of this State. . . . Such special appearance shall be made by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion . . . . Every appearance, prior to judgment, not in compliance with this rule is a general appearance.

2.    Any motion to challenge the jurisdiction provided for herein shall be heard and determined before a motion to transfer venue or any other plea or pleading may be heard. No determination of any issue of fact in connection with the objection to jurisdiction is a determination of the merits of the case or any aspect thereof.

TEX. R. CIV. P. 120a(1)–(2). A party availing itself of the special appearance procedure in Rule 120a must strictly comply with the terms of the rule because failure to do so results in waiver. *Trenz v. Peter Paul Petroleum Co.*, 388 S.W.3d 796, 800 (Tex. App.—Houston [1st Dist.] 2012, no pet.). A party waives its special appearance, and enters a general appearance, when it: (1) invokes the judgment of the court on any question other than the court's jurisdiction; (2) recognizes by its acts that an action is properly pending; or (3) seeks affirmative action from the court.

29

*Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004) (per curiam) (citing

*Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998)). A party does not waive

its jurisdictional challenge by seeking affirmative relief consistent with the special

appearance. *Nationwide Distrib. Servs., Inc. v. Jones*, 496 S.W.3d 221, 225 (Tex.

App.—Houston [1st Dist.] 2016, no pet.).

The plain language of Rule 120a requires that a special appearance be filed

prior to a motion to transfer venue or any other plea, pleading, or motion—the "due

order of pleading" requirement. *Exito Elecs.*, 142 S.W.3d at 305. Rule 120a also

"dictates the order in which motions may be heard with respect to a special

appearance—the due-order-of-hearing requirement." *Trenz*, 388 S.W.3d at 800.

"The test for whether a party has made a general appearance by obtaining a hearing

on another motion before obtaining a ruling on his special appearance is whether the

other motion sought 'affirmative relief inconsistent with [his] assertion that the

district court lacked jurisdiction.'" *Id.* at 803 (quoting *Dawson-Austin*, 968 S.W.2d

at 323).

Hartley argues that PetroSaudi waived its special appearance because

PetroSaudi filed its special appearance in July 2018, amended it three times over the

next seven months, passed the hearing that was scheduled on its special appearance

in March 2019, and did not immediately re-set the special appearance for a hearing.

Hartley argues that PetroSaudi's "delay in bringing its special appearance before the

trial court waived its right to argue that it is not subject to the personal jurisdiction of that court." Hartley cites no law for the proposition that delay alone is enough to waive a special appearance.

Hartley does not contend that PetroSaudi violated either the due-order-of-pleading requirement or the due-order-of-hearing requirement. The record reflects that PetroSaudi's special appearance, filed on July 18, 2018, was the first pleading that PetroSaudi filed in this case, thus satisfying the due-order-of-pleading requirement. *See* TEX. R. CIV. P. 120a(1) ("Such special appearance shall be made by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion . . . ."). The record also reflects that, although PetroSaudi filed a motion to quash and a motion for a protective order—seeking to halt Hartley's pursuit of allegedly merits-based discovery while the special appearance remained pending— its special appearance was the first pleading brought to a hearing before the trial court, thus satisfying the due-order-of-hearing requirement. *See* TEX. R. CIV. P. 120a(2) ("Any motion to challenge the jurisdiction provided for herein shall be heard and determined before a motion to transfer venue or any other plea or pleading may be heard.").

The plain language of Rule 120a does not contain a requirement that a special appearance be brought before the trial court within a specified time period, and we

decline to impose such a requirement here.[7] We agree with PetroSaudi that in this

case, in which there was a delay before PetroSaudi's special appearance was brought

to a hearing but the special appearance was still the first pleading heard by the trial

court, it did not waive its special appearance. We now turn to the merits of

PetroSaudi's special appearance.

---

[7] We note that our sister courts have held that "[a] defendant waives his special appearance by not timely pressing for a hearing." *Milacron Inc. v. Performance Rail Tie, L.P.*, 262 S.W.3d 872, 876 (Tex. App.—Texarkana 2008, no pet.) (stating such in case in which defendant filed special appearance after opening statements and did not secure ruling on special appearance before proceeding to trial on merits); *Bruneio v. Bruneio*, 890 S.W.2d 150, 154 (Tex. App.—Corpus Christi–Edinburg 1994, no writ) (stating, in case in which defendant filed special appearance but did not seek hearing on that issue before case went to trial on merits, that specially-appearing defendant bears burden to request hearing and "specifically call that request to the trial court's attention" and stating that defendant "waives his special appearance by not timely pressing for a hearing thereon"); *Steve Tyrell Prods., Inc. v. Ray*, 674 S.W.2d 430, 436–37 (Tex. App.—Austin 1984, no writ) (holding, in case in which defendants filed special appearance after default judgment was rendered and then moved for new trial before trial court held hearing on special appearance, that defendants "waived their special appearance by not timely pressing for a hearing on their special appearance motion to the jurisdiction"); *see also Kehoe v. Pollack*, 526 S.W.3d 781, 789–90 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A defendant waives its special appearance by failing to get a ruling on the special appearance before the trial on the merits begins or before the court adjudicates the merits of the claims against the defendant."). None of these cases require a special appearance to be heard within a specific time frame; instead, they comport with the due-order-of-hearing requirement that, generally, a special appearance must be the first matter heard by the trial court to avoid waiver of the special appearance. Here, although one year passed between PetroSaudi's filing of its special appearance and the hearing on its special appearance, the special appearance was the first matter heard by the trial court, and thus PetroSaudi complied with the due-order-of-hearing requirement.

### D.  *Minimum Contacts with Texas*

#### 1.  Whether PetroSaudi has an office in Texas

PetroSaudi argues that it lacks minimum contacts with Texas to support the exercise of either general or specific jurisdiction. Specifically, it argues that it is a Cayman Islands corporation with its principal place of business in London, and it does not have an office located in Houston—instead, that office belongs to Procurement Services, PetroSaudi's wholly-owned subsidiary. As evidence supporting this argument, PetroSaudi points to the affidavit and deposition testimony of Myers and the affidavit of Aguero. It also argues that it does not manage or operate the vessel on which Hartley was allegedly injured, that this vessel has never been chartered to a Texas company, and that PetroSaudi has never entered into a drilling contract with a Texas company. It further argues that it does not solicit business in Texas, does not own property in Texas, does not keep business records in Texas, has not been involved in any banking or accounting work in Texas, has never performed any work in whole or in part in Texas, has never paid any taxes in Texas, and has never held any corporate meetings in Texas. PetroSaudi acknowledges that it has occasionally sent employees to Texas for training and seminars. PetroSaudi argues that this contact is not sufficient to confer jurisdiction upon it.

Hartley disputes PetroSaudi's contention that it does not have an office in Texas. He argues that the office on the North Sam Houston Parkway in Houston is

33

not just the office of Procurement Services, but is also an office of PetroSaudi itself. As evidence supporting his argument, Hartley presented invoices from Spencer Ogden concerning Hartley's work on the vessel that were addressed to "PetroSaudi Oil Services Ltd." and listed the address on the North Sam Houston Parkway, numerous emails from Brian Davis—who identified himself as a "Crewing Manager"—concerning Hartley's travel information after his injury that stated "PetroSaudi Oil Services Ltd." and the North Sam Houston Parkway address in the signature block, documents from the travel agency that booked Hartley's return flight and listed "PetroSaudi Oil Services" and the North Sam Houston Parkway address, and evidence that several Procurement Services employees, in their email signature blocks and LinkedIn profiles, listed "PetroSaudi Oil Services Ltd." and the North Sam Houston Parkway address. Hartley presented compliance documents, safety management certificates, and ship security certificates for the vessel, all created by a third party, that listed "PetroSaudi Oil Services Ltd." and the North Sam Houston Parkway address. Hartley also presented an email sent by Procurement Services' Human Resources Manager on behalf of Myers concerning the future of the vessel that referred to the "Houston office," "Oil Services," an "Executive Team" in London, and a "management team" in Houston. None of these documents referenced Procurement Services.

The trial court thus had before it conflicting evidence concerning whether PetroSaudi has an office in Houston at the North Sam Houston Parkway address. When, as here, the trial court does not make findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by the evidence. *See Bell*, 549 S.W.3d at 558. We presume that the trial court resolved all factual disputes in favor of its judgment. *See Coleman*, 83 S.W.3d at 806. We therefore imply a factual finding that PetroSaudi has an office in Houston.

PetroSaudi argues on appeal that this finding is not supported by legally or factually sufficient evidence. A legal sufficiency challenge must fail if there is any evidence of probative force to support the challenged finding. *Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores*, 270 S.W.3d 741, 751 (Tex. App.—Dallas 2008, pet. denied). When reviewing a finding for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *Washington DC Party Shuttle*, 406 S.W.3d at 729. Here, the evidence is conflicting concerning whether PetroSaudi has an office in Houston at the North Sam Houston Parkway address. Because Hartley presented some evidence of probative force supporting the implied finding that PetroSaudi does have an office in Houston, we cannot conclude that this finding is not supported by legally sufficient evidence.

Similarly, although the evidence is conflicting, the trial court's implied finding is not so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See id.* Myers, the president of PetroSaudi, testified in his affidavit and in his deposition that PetroSaudi is registered in the Cayman Islands, that he is its sole employee and that he works in London, and that PetroSaudi has never had an office in Texas. Aguero, the former Commercial Finance Manager of Procurement Services, testified similarly in his affidavit. The trial court had evidence before it, however, that Procurement Services employees routinely represented through their email signature blocks that their employer was "PetroSaudi Oil Services Ltd." with an address on the North Sam Houston Parkway in Houston. Myers himself, in an email entitled "PetroSaudi Oil Services Town Hall Conference call script," referred to "Oil Services," a "Houston office," an "Executive Team" in London, and a "management team" in Houston. Spencer Ogden invoiced "PetroSaudi Oil Services Ltd." at this Houston address for payment for Hartley's work on the vessel, the travel agency hired to obtained plane tickets for Hartley to the United States after his injury referred to "PetroSaudi Oil Services Ltd" at the Houston address, and the organization responsible for obtaining various certifications for the vessel also referred to "PetroSaudi Oil Services Ltd" at the Houston address. This evidence is more than an isolated reference to PetroSaudi and a Houston address. We conclude that factually sufficient evidence supports the trial

court's implied finding that PetroSaudi has an office in Houston. We now turn to whether exercising personal jurisdiction over PetroSaudi comports with due process guarantees.

## 2. General jurisdiction

Hartley argues that PetroSaudi's contacts with Texas, specifically, its office in Houston, subject it to both general and specific jurisdiction. As stated above, general jurisdiction is established when a defendant's affiliations with the state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *M & F Worldwide*, 512 S.W.3d at 885 (quoting *Goodyear Dunlop Tires Operations*, 564 U.S. at 919); *Searcy*, 496 S.W.3d at 72 ("[G]eneral jurisdiction relies on the defendant itself being tied up—almost entangled in a web—with the forum state."). Typically, for a corporation, the "paradigm" forums that can exercise general jurisdiction are the corporation's place of incorporation and its principal place of business, *see Daimler AG*, 571 U.S. at 137, although the exercise of general jurisdiction is not limited to these forums, and, in exceptional cases, "a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *BNSF Ry.*, 137 S. Ct. at 1558. "Courts do not have general jurisdiction over corporate defendants that are neither incorporated in the forum state nor have their principal place of business there,

absent some relatively substantial contacts with the forum state." *Searcy*, 496 S.W.3d at 72.

This Court has stated that, for a Texas court to exercise general jurisdiction over a defendant, the defendant "usually 'must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.'" *Predator Downhole*, 504 S.W.3d at 407 (quoting *PHC-Minden*, 235 S.W.3d at 168). The maintenance of an office or a physical presence in Texas is an indicator of a corporation's connection with Texas. *Bautista v. Trinidad Drilling Ltd.*, 484 S.W.3d 491, 502 (Tex. App.—Houston [1st Dist.] 2016, no pet.). However, having an office or a physical presence in Texas "does not require a finding of general jurisdiction." *Waterman S.S. Corp. v. Ruiz*, 355 S.W.3d 387, 418–19 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 217 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)). The significance of an office in Texas depends on the type and nature of the office maintained. *Id.* at 419; *Alenia Spazio*, 130 S.W.3d at 217 ("If a defendant maintains a permanent general business office through which it solicits business in Texas, then this factor tends to weigh strongly in favor of general jurisdiction."). "[G]eneral jurisdiction is appropriate if the nature of a defendant's contacts with the forum is central to its business." *RSR Corp. v.*

*Siegmund*, 309 S.W.3d 686, 708 (Tex. App.—Dallas 2010, no pet.) (concluding that minimum contacts supported exercise of general jurisdiction over company where company's main business was "to search for possible international business opportunities for one client and to provide services for managing construction projects for another client," employee who worked out of home office in Dallas was "the sole provider for [the company's] international business development services," and employee "actively managed one of the company's main clients"); *see Bautista*, 484 S.W.3d at 502 (stating that general jurisdiction inquiry is whether quality and nature of contacts in Texas render corporation "essentially at home" in Texas).

The special appearance record contains evidence that PetroSaudi was incorporated in the Cayman Islands, had its principal place of business in London, where Myers worked, and had an office in Houston. The business of PetroSaudi, as well as that of its subsidiaries Procurement Services and PetroSaudi (Venezuela), was focused on finding opportunities for and operating the vessel, a drillship which, at the time of Hartley's injury, was anchored off the coast of Trinidad and Tobago. Activities conducted in the Houston office included obtaining supplies and crew for the vessel, such as contracting with third-party companies like Spencer Ogden, and making travel arrangements for crew personnel. Email correspondence reflects that

the Human Resources team and a "management team" were located in Houston.[8]

The record contains evidence—specifically, two "Company Employment Agreements"—that PetroSaudi hired two Texas residents to work on the vessel and that their "Point of Origin" was Houston. These contracts specifically stated "PetroSaudi Oil Services Ltd." as the employer. Although Myers testified in his deposition and Aguero testified in his affidavit that these contracts were "mistakenly" prepared in PetroSaudi's name, and should have instead been prepared in the name of PetroSaudi (Venezuela), the trial court, as the factfinder, could have found this explanation to be not credible and so resolved this dispute against PetroSaudi. *See Coleman*, 83 S.W.3d at 806 (presuming that trial court in special appearance resolved all disputed facts in favor of judgment); *Watamar Hldg.*, 583 S.W.3d at 325 (stating that we may not substitute our judgment for that of factfinder or pass upon credibility of witnesses).

---

[8]     PetroSaudi argues that no "management team" existed in Houston because the only employee of PetroSaudi was Myers, who worked in London, and he was the "management team." The September 2017 email sent by Nysia Gaskin on behalf of Myers specifically stated, "I [Myers] will be flying to Houston next week to work with the management team to make more detailed plans." PetroSaudi argues on appeal that this refers to Procurement Services' management team. However, Procurement Services is not mentioned in this email; only PetroSaudi Oil Services is mentioned. We presume that the trial court resolved this factual dispute in favor of its judgment and impliedly found that a PetroSaudi management team is located in the Houston office. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

It is clear from the evidence that the work performed in the Houston office was integral to the operation of the vessel, the success of which was the focus of PetroSaudi's business. The Houston office was not merely incidental to PetroSaudi's work but was instead akin to a "general business office" located in Texas. We therefore conclude that PetroSaudi's contacts with Texas were such that it was essentially "at home" in Texas and, therefore, the trial court did not err in ruling that PetroSaudi had sufficient minimum contacts with Texas to support the exercise of personal jurisdiction. *See Bautista*, 484 S.W.3d at 502; *Siegmund*, 309 S.W.3d at 708.

### 3. Fair play and substantial justice

As we have determined that PetroSaudi has sufficient minimum contacts with Texas to support personal jurisdiction, we now must decide whether exercising that jurisdiction comports with traditional notions of fair play and substantial justice. *See Bell*, 549 S.W.3d at 559; *Retamco Operating*, 278 S.W.3d at 341. In making this determination we consider the following factors, when appropriate:

> (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies.

*Cornerstone Healthcare Grp. Hldg., Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 74 (Tex. 2016); *Moncrief Oil Int'l*, 414 S.W.3d at 155. "If a nonresident has

minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Moncrief Oil Int'l*, 414 S.W.3d at 154–55. The defendant bears the burden of presenting a compelling case that the presence of some consideration would render the exercise of jurisdiction over it unreasonable. *Hoagland v. Butcher*, 474 S.W.3d 802, 816 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

On appeal, PetroSaudi argues, in a conclusory statement, that because it lacks sufficient minimum contacts with Texas, exercising personal jurisdiction over it would not comport with traditional notions of fair play and substantial justice. In its special appearance, it argued that litigating this case in Texas would be a great burden because it does not have minimum contacts with Texas, Hartley is a Louisiana resident, none of the events giving rise to the litigation occurred in Texas, and no relevant medical or fact witnesses are located in Texas. PetroSaudi argued that because this dispute is "between two non-Texas citizens arising out of an alleged incident that occurred outside of Texas and for which no medical treatment has been rendered in Texas," Texas has no special interest in adjudicating this dispute. PetroSaudi also argued that dismissal of the suit against it would not prevent Hartley from obtaining relief because "there are other forums available to him, *i.e.*, Louisiana (Plaintiff's residence)."

We have concluded, however, that evidence supports the trial court's implied finding that PetroSaudi maintains an office in Houston and that it has sufficient minimum contacts with Texas to support the exercise of jurisdiction in this state. Although it might be burdensome for Myers, as PetroSaudi's president, to travel to Texas to participate in litigation, "the same can be said of all nonresidents" and "[d]istance alone cannot ordinarily defeat jurisdiction." *Moncrief Oil Int'l*, 414 S.W.3d at 155; *Guardian Royal Exch. Assurance*, 815 S.W.2d at 231 (noting that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity") (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Furthermore, there is evidence in the record that Myers has traveled to Houston on business before. PetroSaudi might be burdened by having to participate in litigation in Texas—a burden that would occur regardless of where Hartley sued PetroSaudi—but PetroSaudi has not demonstrated that this burden is an unreasonable one. *See Hoagland*, 474 S.W.3d at 816 (stating that defendant bears burden of presenting "compelling case" that Texas's exercise of jurisdiction over it would be unreasonable).

Although PetroSaudi is correct that Hartley is not a Texas resident, his alleged injury did not occur in Texas, he did not seek medical treatment in Texas, and the vessel was not located in Texas, and therefore Texas does not have as great an

interest in this proceeding as it would were Hartley a Texas resident or his injury occurred in Texas, Hartley also sued two Spencer Ogden entities and Procurement Services, all of which are Texas residents and generally appeared in the underlying lawsuit. Procurement Services is owned by PetroSaudi. Litigating the claims against PetroSaudi, an entity that has minimum contacts with Texas, along with the other named defendants together in Texas promotes judicial economy. *See Cornerstone*, 493 S.W.3d at 74 (considering facts that several other defendants had not challenged jurisdiction and litigating claims against all defendants together promoted judicial economy).

We conclude that PetroSaudi has not presented a "compelling case" that the exercise of jurisdiction over it in Texas would be unreasonable such that exercising jurisdiction would offend traditional notions of fair play and substantial justice. *See Moncrief Oil Int'l*, 414 S.W.3d at 154–55 ("If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice."). We hold that the trial court did not err by denying PetroSaudi's special appearance.

We overrule PetroSaudi's second issue.[9]

---

[9] Because we hold that the trial court did not err to the extent it concluded that PetroSaudi itself had minimum contacts with Texas, we need not address PetroSaudi's third issue—whether the trial court erred by impliedly concluding that Procurement Services and PetroSaudi were alter egos, such that Procurement Services' contacts with Texas could be imputed to PetroSaudi.

## Conclusion

We affirm the order of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Lloyd, and Landau.